NORMAN, Exr., Appellee,

v.

OHIO STATE UNIVERSITY HOSPITALS, Appellant.

NORMAN, Exr., Appellant,

v.

OHIO STATE UNIVERSITY HOSPITALS, Appellee.

[Cite as *Norman v. Ohio State Univ. Hosp.* (1996), 116 Ohio App.3d 69.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

Nos. 96API04–403 and 96API04–404.

Decided Dec. 3, 1996.

*Wolske & Blue* and *Walter J. Wolske,* for plaintiff.

*Emens, Kegler, Brown, Hill & Ritter, William J. Brown, R. Kevin Kerns* and *Karl W. Schedler,* for defendant.

*Jacobson, Maynard, Tuschman & Kalur, Karen L. Clouse, Gayle E. Arnold* and *Maurice N. Milne III,* for Donald K. Bryan, M.D.

Bowman, Judge.

Plaintiff-appellant, John Norman, individually and as the executor of the estate of his spouse, Sandra K. Norman, and defendant-appellant, Ohio State University Hospitals ("University Hospitals"), appeal separately from a judgment of the

Ohio Court of Claims finding that Donald K. Bryan, M.D. ("Dr. Bryan"), was acting within the scope of his employment with University Hospitals when he treated Sandra Norman, thus rendering University Hospitals liable and Dr. Bryan personally immune from suit under R.C. 9.86 and 2743.02(F) for medical malpractice allegedly committed in the course of that treatment.

On the evening of Saturday, December 10, 1988, Sandra Norman was admitted to University Hospitals' clinic in labor. The clinic provides medical care to the public and is staffed by residents; however, because residents have not completed their post-doctoral education, they must be supervised by physicians who are fully accredited in their respective areas of specialization. At the time of Norman's admission to the clinic, Dr. Bryan, a board-certified obstetrician/gynecologist ("OB/Gyn"), was the supervising OB/Gyn on call in the clinic. Dr. Bryan is employed by University Hospitals as an assistant clinical professor in University Hospitals' OB/Gyn department, and maintains a successful private practice.

Norman's pregnancy was complicated by the fact that she was partially paralyzed and had very limited breathing capacity as a result of having had polio. Consequently, Ann Wurst, M.D. ("Dr. Wurst"), the chief OB/Gyn resident on duty, took charge of her case. Dr. Wurst was familiar with Norman's condition, as Norman had been seen regularly in the clinic during her pregnancy. Dr. Wurst notified Dr. Bryan of Norman's admission, briefed him on her condition, and presented him with a treatment plan that called for Norman to deliver her baby vaginally. Dr. Bryan approved the treatment plan.

During the early morning hours of December 11, 1988, Dr. Bryan was notified by Dr. Wurst that Norman was having trouble delivering her baby vaginally. After examining Norman, Dr. Bryan determined that it would be necessary for Dr. Wurst to deliver Norman's baby by cesarean section. During the course of the cesarean section, Dr. Wurst experienced difficulty in removing the baby from Norman's uterus and requested assistance from Dr. Bryan. Dr. Bryan temporarily took charge of the procedure and delivered the baby. Subsequently, Norman was transferred to intensive care, where she died on December 25, 1988.

On May 24, 1990, plaintiff filed a medical malpractice action against Dr. Bryan and others in the Franklin County Court of Common Pleas. On that same date, plaintiff filed an action based upon the same conduct against University Hospitals in the Ohio Court of Claims. Subsequently, plaintiff's action in the court of common pleas was stayed pending a determination by the Court of Claims regarding whether Dr. Bryan is immune for his alleged malpractice in treating Norman.

On March 4, 1994, the Court of Claims scheduled a non-oral hearing to determine whether Dr. Bryan is entitled to immunity. On June 17, 1994, Dr. Bryan filed a motion in the Court of Claims requesting an evidentiary hearing on

the issue of his immunity. The Court of Claims overruled Dr. Bryan's motion, noting that he was "not a party" to plaintiff's action in the Court of Claims. Nevertheless, on December 15, 1994 and September 29, 1995, the Court of Claims held an evidentiary hearing to determine whether Dr. Bryan was immune. As there was no allegation that Dr. Bryan had acted with malicious purpose, in bad faith, or in a wanton or reckless manner in treating Norman, the sole issue for the Court of Claims was whether Dr. Bryan was within the scope of his employment with University Hospitals when he treated Sandra Norman.

On February 29, 1996, the Court of Claims issued a decision wherein it found that Dr. Bryan was acting within the scope of his employment when he treated Norman. Accordingly, the court concluded that Dr. Bryan is immune from suit for his treatment of Norman pursuant to R.C. 9.86 and 2743.02(F). Plaintiff appeals therefrom, assigning the following error:

"The trial court erred to the substantial prejudice of plaintiff-appellant in ordering that Donald K. Bryan, M.D., is entitled to civil immunity pursuant to R.C. § 9.86 and § 2743.02(F)."

University Hospitals appeals therefrom assigning the following error:

"The trial court erred in granting appellee civil immunity pursuant to Sections 9.86 and 2743.02(F), Ohio Revised Code."

■ Prior to addressing the parties' assignments of error, we must consider plaintiff's motion to strike all reference to Dr. Bryan as "appellee" in University Hospitals' brief and to prohibit Dr. Bryan from filing a brief in this appeal. Essentially, plaintiff argues that, because Dr. Bryan was not a party to the proceedings in the Court of Claims, he should not be permitted to participate in the appeal from those proceedings.

Although the Court of Claims held that Dr. Bryan was not a party to the proceedings therein, the court nonetheless permitted Dr. Bryan to present evidence and to examine and cross-examine witnesses during the evidentiary hearing on the question of his immunity. Loc.R. 4.1 of the Ohio Court of Claims provides in relevant part as follows:

"A plaintiff seeking [an immunity] determination under R.C. 2743.02(F) shall file * * * a motion requesting that the court of claims determine whether the officer or employee is entitled to personal immunity under R.C. 9.86 and whether the courts of common pleas have jurisdiction over the civil action.

" * * * [T]he motion * * * will be heard on evidence * * * submitted by the moving party, the state agency, and [by] the officer or employee." (Emphasis added.)

 Regardless of whether the Court of Claims properly determined that Dr. Bryan was not a party to the immunity determination, he was permitted to participate therein as a party. Having participated in the proceeding from which this appeal is taken, Dr. Bryan is entitled to participate in the appeal. Plaintiff's motion is overruled.

Although plaintiff and University Hospitals have each raised a separate assignment of error, the crux of both is that the Court of Claims' finding that Dr. Bryan was within the scope of his employment when he treated Norman is against the manifest weight of the evidence. Therefore, we will address these two assignments together.

 When presented with a manifest weight of the evidence argument, an appellate court will not overturn a judgment which is supported by some competent, credible evidence going to all essential elements of the case. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

Pursuant to R.C. 9.86 and 2743.02(F), a state employee may be entitled to personal immunity for ordinary negligence. R.C. 9.86 provides:

"Except for civil actions that arise out of the operation of a motor vehicle and civil actions in which the state is the plaintiff, no officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner.

"This section does not eliminate, limit, or reduce any immunity from civil liability that is conferred upon an officer or employee by any other provision of the Revised Code or by case law. This section does not affect the liability of the state in an action filed against the state in the court of claims pursuant to Chapter 2743. of the Revised Code."

R.C. 2743.02(F) provides in relevant part:

"A civil action against an officer or employee, as defined in section 109.36 of the Revised Code, that alleges that the officer's or employee's conduct was manifestly outside the scope of his employment or official responsibilities, or that the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner shall first be filed against the state in the court of claims, which has exclusive, original jurisdiction to determine, initially, whether the officer or employee is entitled to personal immunity under section 9.86 of the Revised Code and whether the courts of common pleas have jurisdiction over the civil action."

Beginning with *Katko v. Balcerzak* (1987), 41 Ohio App.3d 375, 536 N.E.2d 10, this court began outlining a framework for addressing "scope of employment" cases involving physicians who hold faculty positions at state universities while also maintaining private medical practices. In *Katko*, plaintiff appealed from a grant of summary judgment holding that Dr. Stanley Balcerzak, a member of University Hospitals' faculty who also maintained a private medical practice through a medical partnership, was within the scope of his employment with University Hospitals when he rendered medical services to plaintiff's decedent. The evidence revealed that Dr. Balcerzak treated plaintiff's decedent as a private patient, and billed for his services through his medical partnership. No part of Dr. Balcerzak's fees for treating plaintiff's decedent were paid to University Hospitals.

This court reversed the trial court's grant of summary judgment, concluding that a factual issue existed regarding whether Dr. Balcerzak was within the scope of his employment with University Hospitals when he rendered medical services to plaintiff's decedent. Specifically, we held, 41 Ohio App.3d at 379, 536 N.E.2d at 14:

" * * * The fact that Dr. Balcerzak rendered the services to plaintiff's decedent as a private patient and received payment for his services through the partnership, no part of which was paid over to Ohio State University, tends to indicate that, in treating the patient, Dr. Balcerzak was acting outside the scope of his duties for Ohio State University and conducting a business of his own, albeit in connection with his employment at Ohio State University."

In *York v. Univ. of Cincinnati Med. Ctr.* (Apr. 23, 1996), Franklin App. No. 95AP109–1117, unreported, 1996 WL 200324, this court followed the reasoning of *Katko*. *York* involved a medical malpractice action against the University of Cincinnati Medical Center ("UC") and Dr. John Tew, the chairman of the Department of Neurosurgery at UC and the director of the academic division of Mayfield Neurological Institute, Inc. ("MNI"), a private medical practice group. The action arose out of surgery performed by Dr. Tew on plaintiff. The evidence revealed that, prior to the surgery, Dr. Tew had entered into an agreement to provide plaintiff with medical services for a fee. Plaintiff was billed by MNI for Dr. Tew's services, and UC received only two percent of Dr. Tew's fee. MNI also provided Dr. Tew's medical malpractice insurance, and the bulk of Dr. Tew's income was attributable to his private medical practice with MNI. The Court of Claims determined that Dr. Tew was manifestly outside the scope of his employment with UC when he treated plaintiff.

On appeal, this court affirmed the judgment of the Court of Claims, holding as follows:

"Applying the logic of the *Katko* decision herein leads this court to the same conclusion reached by the Court of Claims. Dr. Tew was paid nothing by the University for the medical services rendered * * * [plaintiff]. This fact evidences the lack of an employment relationship with respect to the medical services rendered. See *Latham v. Ohio State Univ. Hosp.* (1991), 71 Ohio App.3d 535, 538, 594 N.E.2d 1077, 1079–1080. Although the university did receive a small financial gain from the surgical procedure performed on Mr. York, we do not believe that this fact, standing alone, gives rise to an employment relationship between the university and Dr. Tew with respect to the surgery." *York* at 1602.

In *Balson v. Ohio State Univ.* (1996), 112 Ohio App.3d 33, 677 N.E.2d 1216, this court again followed *Katko* and determined that Dr. Patrick Ross was outside the scope of his employment with University Hospitals when he treated plaintiff's decedent.

In *Balson*, Dr. Ross was employed as an assistant professor in University Hospitals' Department of Surgery, and was a member of the Department of Surgery Corporation, P.C. ("DSC"), a private medical practice group. Plaintiff's decedent was referred to Dr. Ross by one of Dr. Ross's colleagues. Plaintiff's decedent was billed for Dr. Ross's services by DSC and payment was made directly to DSC by decedent's insurance provider. DSC provided Dr. Ross's medical malpractice insurance. Although DSC contributed a portion of Dr. Ross's fee to University Hospitals' Teaching and Research Fund and Academic Enrichment Program, the majority of Dr. Ross's income was attributable to his private medical practice with DSC. Based upon these facts, this court determined that the Court of Claims' decision, holding that Dr. Ross was manifestly outside of his employment with University Hospitals when he treated plaintiff's decedent, was supported by the evidence.

Our most recent application of the framework first outlined in *Katko* came in *Harrison v. Univ. of Cincinnati Hosp.* (June 28, 1996), Franklin App. No. 96API01–81, unreported, 1996 WL 362055. *Harrison* involved a medical malpractice suit by Renate Mueller against Dr. Thomas Tami and the University of Cincinnati Hospital ("UC"). The suit resulted from surgery performed by Dr. Tami on Mueller. Dr. Tami was a faculty member at UC and a member of University Ear, Nose and Throat Specialists, Inc. ("UENTS"), a private practice group. Mueller was treated by Dr. Tami through UENTS rather than through UC. UENTS provided Dr. Tami's medical malpractice insurance, and billed and collected for Dr. Tami's fee for treating Mueller. While UENTS contributed a portion of Dr. Tami's fees to UC, UENTS was Dr. Tami's principal source of income. Based upon these facts, we found that Dr. Tami was outside the scope of his employment with UC when he operated upon Mueller.

In the present case, the evidence adduced at the hearing revealed the following: As an assistant clinical professor in University Hospitals' OB/Gyn department, Dr. Bryan is responsible for supervising and teaching OB/Gyn residents, and is required to be on call in the clinic for one twenty-four-hour period, from 7:00 p.m. on Saturday through 7:00 p.m. on Sunday, each month to supervise the OB/Gyn residents working there.

Dr. Bryan is a "geographic" rather than a "full-time" member of University Hospitals' OB/Gyn faculty. As a "geographic" faculty member, Dr. Bryan receives an annual salary of $6,000 from the university, and is eligible for "attending"[1] staff privileges at University Hospitals; however, Dr. Bryan earns his living from the private practice of medicine. A full-time faculty member, in contrast, receives a much larger salary from the university, but may earn no money from private practice. Although Dr. Bryan earns most of his income from his private practice, his teaching responsibilities extend to his private patients.

In addition to his faculty position with University Hospitals, Dr. Bryan is a member of Kingsdale Gynecological Associates ("KGA"). KGA is Dr. Bryan's private practice group and the source of most of his income. Dr. Bryan sees his KGA patients at his office, and when those patients require hospitalization, they may choose to be hospitalized at any one of the three hospitals at which Dr. Bryan has staff privileges. KGA patients are billed directly by KGA for Dr. Bryan's services. KGA determines which weekend each month Dr. Bryan will be on call in the clinic. KGA also provides Dr. Bryan's medical malpractice insurance.

Dr. Bryan is also a member of Reproductive Research and Educational Association, Inc. ("RREA"), a nonprofit Ohio corporation. Dr. Bryan belongs to RREA by virtue of his faculty position with University Hospitals' OB/Gyn department, RREA's membership being made up of all members of the OB/Gyn faculty. RREA was established to fund OB/Gyn research and education at University Hospitals. While one of RREA's principal purposes is to supplement the income of University Hospitals' OB/Gyn residents, University Hospitals is not a member of RREA. RREA bills and collects the fees generated by its members while on faculty call in the clinic. RREA has, in turn, contracted with Physicians Management Services, a billing service that is part of University Hospitals, to do all of its billings and collections. RREA retains seventy percent of these fees to fund its research and teaching mission, and the remaining thirty percent is paid to the physicians who generated the fees.

---

1. Pursuant to Section 335–43–07 of University Hospitals' Medical Staff Bylaws, the "attending staff" includes those physicians who are fully accredited and who possess full voting and patient admission privileges, in contrast to medical residents and interns who are classified as "limited staff" members.

Applying the framework developed in *Katko, York, Balson* and *Harrison* to the facts of the instant case, we conclude that the Court of Claims properly determined that Dr. Bryan was within the scope of his employment with University Hospitals when he treated Sandra Norman.

■ One of the determining factors in finding that the physicians in *Katko, York, Balson* and *Harrison* were acting outside the scope of their employment was that the patients therein were private patients of the physicians, rather than patients of the universities. Here, the evidence indicates that Norman received all of her prior care in the clinic. Dr. Bryan's first and only contact with Norman was in the clinic on September 11, 1988, where he was on call as part of his faculty duties. Except for providing Dr. Bryan's medical malpractice insurance, Dr. Bryan's private practice group, KGA, had no connection with Norman. Dr. Bryan did not see Norman in his KGA office, nor did KGA bill Norman for Dr. Bryan's services. While the provision of malpractice insurance is a factor to be considered under the *Katko* framework, standing alone it is not dispositive of a physician's employment relationship with the state. Although RREA billed Norman for Dr. Bryan's services, RREA is not Dr. Bryan's private practice group; rather, RREA is a nonprofit corporation set up primarily for the benefit of University Hospitals.

The second major determinant under *Katko* and its progeny is the university's financial gain from the medical treatment at issue relative to the physician's financial gain therefrom. In *Katko, York, Balson* and *Harrison,* the physicians retained all or most of the fees generated by the medical treatment at issue, while the universities received, at best, a small percentage of those fees. Here, in contrast, University Hospitals received at least seventy percent of the fee generated by Dr. Bryan in treating Norman, while Dr. Bryan had a right to only thirty percent of his fee. Although Dr. Bryan was entitled to thirty percent of the fee collected by RREA for his treatment of Norman, Dr. Bryan had a long-standing policy of not accepting any payment for his work in the clinic. Consequently, one hundred percent of Dr. Bryan's fee for treating Norman was retained by RREA. The fact that University Hospitals received greater financial gain than Dr. Bryan from Dr. Bryan's work further supports the conclusion that Dr. Bryan was working for University Hospitals when he treated Norman.

■ Appellants argue, however, that, pursuant to University Hospitals' Medical Staff Bylaws and Staff Rules and Regulations with which Dr. Bryan agreed to abide when he applied for attending staff privileges at University Hospitals, Norman was Dr. Bryan's private patient. Section 3335–43–03(B) of the staff bylaws provides in relevant part:

"There shall be only one category or classification of patients in the university hospitals, and those patients are the private patients of the medical staff under whose care they are admitted. * * * "

Section 84–03 of the staff rules and regulations further provides:

"All patients entering university hospitals who have not requested the services of a member of the medical staff of university hospitals to be responsible for their care and treatment while a patient therein shall be assigned to a member of the attending staff of the clinical division or service concerned with the treatment of the disease, injury, or condition which necessitated the admission of the patient to university hospitals. * * * "

According to appellants, when Norman was admitted to the clinic without a private physician, she was assigned to Dr. Bryan, pursuant to Section 84–03 of the Staff Rules and Regulations, and, thus, became his private patient pursuant to Section 3335–43–03 of the Staff Bylaws.

The question of whether Norman was Dr. Bryan's private patient is a question of law and fact which must be determined by reference to the actual relationship between the parties. University Hospitals and its medical staff may not circumvent this determination and unilaterally decide the rights of patients and physicians by internal regulatory fiat.

Taken together, the fact that Dr. Bryan rendered treatment to Norman as a clinic patient rather than a private patient, and the fact that seventy percent of Dr. Bryan's fee for his treatment of Norman went to benefit University Hospitals, provide competent, credible evidence to support the Court of Claims' finding that Dr. Bryan was within the scope of his employment with University Hospitals when he treated Norman. Plaintiff's and University Hospitals' assignments of error are overruled.

Having overruled plaintiff's motion to strike and plaintiff's assignment of error, and having overruled University Hospitals' assignment of error, we affirm the judgment of the Court of Claims.

*Judgment affirmed.*

PETREE, P.J., and PEGGY BRYANT, J., concur.