THEOBALD et al., Appellees,

v.

UNIVERSITY OF CINCINNATI, Appellant.

[Cite as *Theobald v. Univ. of Cincinnati*, 160 Ohio App.3d 342, 2005-Ohio-1510.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 02AP–560.

Decided March 31, 2005.

344

346

Douglas C. Holland and James Sullivan, for appellees.

Jim Petro, Attorney General, and Karl W. Schedler, Assistant Attorney General, for appellant.

KLATT, Judge.

{¶ 1} Defendant-appellant, University of Cincinnati ("UC"), appeals from a judgment of the Ohio Court of Claims finding that Frederick A. Luchette, M.D., Jamal Taha, M.D., Harsha Sharma, M.D., and Maureen Parrott, C.R.N.A., were not entitled to personal immunity pursuant to R.C. 9.86 and 2743.02(F). For the following reasons, we reverse the judgment and remand for further proceedings.

{¶ 2} On October 23, 1998, Keith Theobald was involved in a multivehicle collision during which he was thrown from his pick-up truck and seriously injured. Theobald was flown to University Hospital, the closest hospital that could handle the high degree of trauma that he had suffered. Dr. Luchette, the

attending trauma surgeon, admitted Theobald to the hospital and began identifying his injuries. With the other members of the hospital's trauma team, Dr. Luchette determined that Theobald had upper rib fractures, a lacerated spleen, a right wrist fracture, and fractured vertebrae, resulting in paraplegia.

{¶ 3} Because Theobald had suffered a neurological injury, he was assigned to Dr. Taha, the interim director of the neurotrauma team. The morning after the accident, Dr. Taha and a neurotrauma resident examined Theobald and told him that based upon their initial assessment, he needed immediate surgery on his spine. Due to the extent and complexity of Theobald's spinal injury, Dr. Taha decided to involve Dr. Andrew J. Ringer, the chief resident in neurotrauma, in Theobald's care. Dr. Taha and Dr. Ringer discussed Theobald's case and examined his x-rays. After ordering and evaluating more x-rays, Dr. Taha and Dr. Ringer decided that Theobald's spinal injury did, indeed, require surgery. Dr. Ringer then contacted the critical care unit and asked them to determine if Theobald was stable enough to endure surgery. Dr. Luchette assessed Theobald's condition and concluded that he could tolerate the surgery.

{¶ 4} Both Dr. Luchette and Dr. Ringer then met with the Theobalds to discuss the surgery and obtain their consent. Jacqueline Theobald, Theobald's wife, signed two informed consent forms for the surgery: one authorizing treatment by Dr. Luchette and the other authorizing treatment by Dr. Taha.

{¶ 5} Prior to surgery, Amy Wehrman, a student nurse anesthetist, prepared a preoperative anesthesia note, which documented Theobald's history and physical condition. Nurse Parrott reviewed this note and the remainder of Theobald's chart, and then she discussed his history, current physical condition, and the plan for administering anesthesia during the surgery with Nurse Wehrman and Dr. Sharma, the anesthesiologist.

{¶ 6} Theobald's surgery began at approximately 8:00 p.m. on October 24, 1998, with Dr. Luchette opening with the assistance of Dr. Steven Giss, a trauma resident. After Dr. Luchette and Dr. Giss completed the first portion of the surgery, Dr. Taha and Dr. Ringer began freeing Theobald's spinal cord from bone that compressed it. During the surgery, complications arose, and Dr. Luchette reentered the operating room to insert a chest tube. When Dr. Taha and Dr. Ringer completed freeing and stabilizing the spinal cord, Dr. Luchette and Dr. Giss returned to close. The surgery ended at approximately 6:00 a.m. on October 25, 1998.

{¶ 7} Throughout the surgery, Dr. Sharma and Nurse Parrott administered anesthesia and monitored Theobald's medical condition. Nurse Wehrman observed and assisted by keeping records, monitoring vital signs, and drawing blood.

{¶ 8} When Theobald awoke from sedation, he discovered that he was blind and his arms were numb and had little mobility. Despite continued care, both conditions persisted.

{¶ 9} In October 1999, Theobald and his wife, on behalf of herself and the couples' minor children, filed a medical malpractice claim in the Hamilton County Court of Common Pleas against Dr. Luchette, Dr. Taha, Dr. Sharma, and Nurse Parrott, among others. Because Dr. Luchette, Dr. Taha, Dr. Sharma, and Nurse Parrott all asserted the defense of personal immunity, the Hamilton County Court of Common Pleas granted a stay of appellees' malpractice action to allow the Court of Claims to determine if any or all of the health care practitioners were entitled to immunity pursuant to R.C. 9.86 and 2743.02(F). Subsequently, appellees filed a malpractice action in the Court of Claims against UC alleging that Theobald was permanently injured by the health care practitioners' medical negligence. Specifically, appellees alleged that (1) Nurse Wehrman was negligent in the preparation of the preoperative assessment, (2) Dr. Sharma and Nurse Parrott were negligent in assigning the preoperative assessment to Nurse Wehrman, (3) Dr. Sharma and Nurse Parrott were negligent in not verifying the accuracy and completeness of the preoperative assessment, (4) all the health care practitioners were negligent in not obtaining the test and x-ray results necessary for an accurate preoperative assessment, and (5) all the health care practitioners were negligent in providing Theobald medical care during and after his October 25, 1998 surgery. Finally, appellees also alleged that the health care practitioners failed to provide appellees with sufficient, accurate information regarding Theobald's condition and the risks of surgery so that appellees could give informed consent for the October 25, 1998 surgery.

{¶ 10} On November 29, 2001, the Court of Claims conducted an immunity hearing during which the court joined Dr. Taha, Dr. Sharma, and Nurse Parrott as parties to the immunity proceedings. In an order issued December 6, 2001, the Court of Claims also made Dr. Luchette a party to the immunity proceedings. The Court of Claims then issued an order stating that it would determine whether the health care practitioners were entitled to immunity based upon the hearing testimony, as well as any evidentiary materials and briefs the parties submitted.

{¶ 11} On April 23, 2002, the Court of Claims issued a judgment entry denying the health care practitioners personal immunity pursuant to R.C. 9.86 and 2743.02(F). In an accompanying decision, the Court of Claims concluded that Dr. Luchette and Dr. Sharma were not entitled to immunity because neither physician was acting within the scope of his employment when treating Theobald. Further, the Court of Claims held that Dr. Taha was not entitled to immunity because he was not an employee of the state and, even if he was an employee, he

was not acting within the scope of his employment when he treated Theobald. Finally, the Court of Claims held that Nurse Parrott was not entitled to immunity because she was not an employee of the state. UC and each of the health care practitioners appealed from the April 23, 2002 judgment.

{¶ 12} On appeal, UC filed a motion to dismiss the health care practitioners' appeals, arguing that none of them had standing to appeal. This court granted UC's motion and, upon the motion of Dr. Sharma and Nurse Parrott, certified a conflict between the case law of this district and the First District Court of Appeals on the issue of a state employee's right to appeal from an immunity determination by the Court of Claims. This court later stayed proceedings in this appeal pending the Supreme Court of Ohio's determination of the certified conflict.

{¶ 13} On April 14, 2004, the Supreme Court of Ohio decided *Theobald v. Univ. of Cincinnati,* 101 Ohio St.3d 370, 2004-Ohio-1527, 805 N.E.2d 1084, in which it held that "a state employee has no right to participate in the immunity determination proceedings before the Court of Claims or to appeal that determination." Id. at ¶ 6. Once the Supreme Court issued its decision, this court vacated the stay of these proceedings, and we now consider this matter.

{¶ 14} On appeal, UC assigns the following errors:

[1.] The Court of Claims erred in joining Frederick Luchette, M.D., Harsha Sharma, M.D., Jamal Taha, M.D., and Maureen Parrott, C.R.N.A. as parties to the immunity hearing.

[2.] The Court of Claims erred in finding that Jamal Taha, M.D., was not an "employee" for purposes of R.C. 9.86.

[3.] The Court of Claims erred in finding that Maureen Parrott, C.R.N.A. was not an "employee" for purposes of R.C. 9.86.

[4.] The Court of Claims erred in finding that Frederick Luchette, M.D., is not entitled to immunity under R.C. 9.86.

[5.] The Court of Claims erred in finding that Harsha Sharma, M.D., is not entitled to immunity under R.C. 9.86.

[6.] The Court of Claims erred in finding that Jamal Taha, M.D., is not entitled to immunity under R.C. 9.86.

[7.] The Court of Claims erred in finding that Maureen Parrott, C.R.N.A., is not entitled to immunity under R.C. 9.86.

{¶ 15} By its first assignment of error, UC argues that the Court of Claims erred in joining Dr. Luchette, Dr. Taha, Dr. Sharma, and Nurse Parrott as parties to the immunity proceedings. We agree.

{¶ 16} In *Johns v. Univ. of Cincinnati Med. Assoc., Inc.*, 101 Ohio St.3d 234, 2004-Ohio-824, 804 N.E.2d 19, the Supreme Court recently held that a state employee cannot be a party to an immunity determination. In so holding, the Supreme Court recognized that R.C. 9.86 provides state employees with immunity from personal liability under certain circumstances and that, pursuant to R.C. 2743.02(F), the Court of Claims has exclusive jurisdiction to determine if those circumstances exist in each case. The Supreme Court also noted, however, that only the state can be a defendant in original actions filed in the Court of Claims. R.C. 2743.02(E). Construing these statutory provisions together, the Supreme Court held that they, "in effect, preclude[ ] a state employee from being a party to the immunity-determination proceedings." Id. at ¶ 31. See, also, *Theobald*, supra, at ¶ 6 ("[A] state employee has no right to participate in the immunity determination proceedings before the Court of Claims"). Therefore, the Court of Claims erred in joining Dr. Luchette, Dr. Taha, Dr. Sharma, and Nurse Parrott as parties to the proceedings to determine their immunity.

{¶ 17} Nevertheless, this error is not a basis for reversal because the error was harmless under these circumstances. A reviewing court will not disturb a judgment unless the error contained within is materially prejudicial to the complaining party. *Fada v. Information Sys. & Networks Corp.* (1994), 98 Ohio App.3d 785, 792, 649 N.E.2d 904. In other words, a trial court's error provides a basis for reversal only if the error affected a substantial right of the complaining party. Civ.R. 61. When avoidance of the error would not have changed the outcome of the proceedings, then the error neither materially prejudices the complaining party nor affects a substantial right of the complaining party. *Fada*, supra, at 792, 649 N.E.2d 904. Cf. *Crum v. Walters*, Franklin App. No. 02AP–818, 2003-Ohio-1789, 2003 WL 1819117, at ¶ 22, quoting *Hallworth v. Republic Steel Corp.* (1950), 153 Ohio St. 349, 41 O.O. 341, 91 N.E.2d 690, paragraph three of the syllabus ("Such error is considered harmless if it can be said that, in the absence of the error, the 'trier of facts would probably have made the same decision' ").

{¶ 18} In the case at bar, the Court of Claims' error—the joinder of Dr. Luchette, Dr. Taha, Dr. Sharma, and Nurse Parrott as parties to the immunity determination—was beneficial, rather than prejudicial, to UC, the complaining party. Like UC, the health care practitioners argued that they were immune from liability for appellees' injuries. Thus, the interests of UC and the practitioners were aligned, and the inclusion of the practitioners as parties in the proceedings only strengthened UC's position. As the trial court found against UC and the practitioners even with the practitioners' participation, exclusion of the practitioners from the immunity determination proceedings would not have changed the outcome of the proceedings. Therefore, the joinder of the practi-

tioners was not materially prejudicial to UC and did not adversely affect a substantial right of UC.

{¶ 19} Accordingly, we overrule UC's first assignment of error.

{¶ 20} By its second assignment of error, UC argues that the trial court erred in concluding that Dr. Taha was not an UC employee. We agree.

{¶ 21} Pursuant to R.C. 9.86:

Except for civil actions that arise out of the operation of a motor vehicle and civil actions in which the state is the plaintiff, no officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or malicious manner.

Thus, state employees are immune from tort and other liability for wrongs they commit, as long as those wrongs are committed in furtherance of the interests of the state. *Conley v. Shearer* (1992), 64 Ohio St.3d 284, 287, 595 N.E.2d 862. If the employee's acts do not further the interests of the state, then the state has not agreed to accept responsibility for the employee's acts and the employee is personally answerable for his acts in a court of common pleas. Id.

{¶ 22} Accordingly, before finding that a person is entitled to immunity under R.C. 9.86, the Court of Claims must make two findings: (1) that the person is a state officer or employee and (2) that the officer or employee was acting within his scope of employment and without malicious purpose, in bad faith, or in a wanton or reckless manner. If these findings of fact are supported by some competent, credible evidence, they will not be disturbed on appeal as being against the manifest weight of the evidence. *Smith v. Univ. of Cincinnati* (Nov. 29, 2001), Franklin App. No. 01AP–404, 2001 WL 1512098; *Scarberry v. Ohio State Univ. Hosps.* (Dec. 3, 1998), Franklin App. No. 98AP–143, 1998 WL 831578.

{¶ 23} A state employee is "[a] person who, at the time a cause of action against the person arises, * * * is employed by the state." R.C. 109.36(A)(1)(a). In the case at bar, the Court of Claims found that Dr. Taha was employed solely by the Mayfield Clinic, a private practice group. The evidence presented, however, does not support this conclusion. Rather, the evidence shows that while Dr. Taha was an employee of the Mayfield Clinic, he was simultaneously an employee of UC. First, Dr. Taha testified that throughout 1998 he was employed by the UC's College of Medicine as an assistant professor. Second, Dr. Taha produced a letter dated November 1, 1996 from the Chair of the Department of Neurosurgery and the Dean of the College of Medicine extending to Dr. Taha the position of "Assistant Professor of Clinical Neurosurgery Affiliated" effective

from October 1, 1996 through August 31, 1999. Third, Dr. Taha produced a W–2 form showing that he earned $9,863.64 during 1998 from his employment with UC. Fourth, Dr. Taha produced a form entitled "Request for Approval to Perform Outside Activity for Full-time Faculty," in which he requested and received approval from UC to work for the Mayfield Clinic, in addition to his faculty job.

{¶ 24} Despite this evidence, appellees assert that no employment contract existed between Dr. Taha and UC, and that Dr. Taha worked for UC only at the behest of the Mayfield Clinic. Appellees maintain that UC entered into a contract with the Mayfield Clinic for Dr. Taha's expertise and UC compensated the Mayfield Clinic, not Dr. Taha, for his work. Although we conducted a thorough review of the record, we cannot find the contract, or testimony regarding the contract, purportedly executed by UC and the Mayfield Clinic. Further, Dr. Taha testified that UC issued paychecks naming him, not the Mayfield Clinic, as the payee. Therefore, based upon the evidence in the record, we can only conclude that the weight of the evidence proves that Dr. Taha was an employee of UC.

{¶ 25} Accordingly, we sustain UC's second assignment of error.

{¶ 26} By UC's third assignment of error, it asserts that the Court of Claims erred in concluding that Nurse Parrott was not a UC employee. We agree.

{¶ 27} In its decision, the Court of Claims found that Nurse Parrott worked exclusively for University Anesthesia Associates ("UAA"), a private practice plan; that she was not employed by UC; and that she never received any pay from UC. Indeed, in her deposition, Nurse Parrott testified that she never worked for UC and never received pay from UC. However, Nurse Parrott also testified that she was a volunteer clinical instructor for UC during 1998 and, in that position, she was required to supervise nurse-anesthetist students.

{¶ 28} Neither Nurse Parrott's admission that she was not a UC employee nor her testimony that she was not compensated by UC is dispositive of her employment status. *Potavin v. Univ. Med. Ctr.* (Apr. 19, 2001), Franklin App. No. 00AP–715, 2001 WL 392492 ("[T]he issue whether a person is an officer or employee of the state cannot be answered simply by an admission that a person is not an employee of the state or by a showing that the employee was not directly compensated by the state"). Rather, in order to determine whether a volunteer clinical instructor at a state university is a state employee for purposes of immunity, this court must analyze the relationship between the university and the instructor's private practice plan. Id.

{¶ 29} In *Potavin,* we held that a volunteer clinical instructor for UC's Department of Obstetrics and Gynecology ("OBGYN Department") was an

employee of the state. There, UC had such a high degree of control over the instructor's practice plan that the dean of the College of Medicine had to approve the amount of compensation the practice-plan employees received. Also, the private practice plan contributed a significant amount of money to the OBGYN Department. Further, the OBGYN Department director testified that the practice plan would not exist if not for its relationship with UC and that UC could not pay its employees if not for its relationship with the practice plan. Given this symbiotic relationship, this court concluded that UC and the practice plan functioned as one entity, even though they were separate legal entities. Therefore, this court held that the volunteer clinical instructor was an employee of the state.

{¶ 30} In the case at bar, UC had significant control over UAA, the private practice plan at issue here, during 1998. Dr. Phillip Bridenbaugh, M.D., the Chairman of the Department of Anesthesia within the UC College of Medicine and president of UAA, testified that UAA was "the practice plan portion of the academic Department of Anesthesia of the College of Medicine." UAA's purpose was to bill and collect payment for clinical services provided by its employees and disburse the revenue collected to the Department of Anesthesia to meet the Department's expenses. Without the revenue collected by UAA, UC would not have had any means to compensate the Department's clinical faculty members. Further, UC exerted control over the outlay of the funds UAA collected by requiring UAA to receive the approval of the Dean of the College of Medicine for its budget and the amount of the salaries it paid its employees. Therefore, we conclude that although UC and UAA were separate legal entities, their relationship was sufficiently close that UAA-employee Nurse Parrott, even though only a volunteer clinical instructor for UC, was an employee of the state for purposes of immunity.

{¶ 31} Accordingly, we sustain UC's third assignment of error.

{¶ 32} By its remaining assignments of error, UC argues that Dr. Luchette, Dr. Taha, Dr. Sharma, and Nurse Parrott were all acting within the scope of their employment with UC when treating Theobald and, therefore, they are immune from personal liability.

{¶ 33} Generally, in cases involving health care practitioners who are also clinical faculty members, immunity hinges upon whether the practitioners were acting within the scope of their employment. As we stated above, a state employee is entitled to immunity, unless that employee is manifestly outside of the scope of employment. R.C. 9.86.[1] Although the term "scope of employment"

---

1. Additionally, a state employee is not entitled to immunity if the employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner. R.C. 9.86. However,

is an elusive concept, both the Supreme Court of Ohio and this court have provided some guidance as to its meaning in the context of R.C. 9.86. *Oye v. Ohio State Univ.*, Franklin App. No. 02AP–1362, 2003-Ohio-5944, 2003 WL 22511511, at ¶ 6. Primarily, a state employee is acting within the scope of his employment if he is acting "in furtherance of the interests of the state." *Conley*, supra, 64 Ohio St.3d at 287, 595 N.E.2d 862. In other words, "conduct is within the scope of employment if it is initiated, in part, to further or promote the master's business." *Patena v. Univ. of Akron* (Apr. 18, 2002), Franklin App. No. 01AP–845, 2002 WL 576095. Conversely, "actions that bear no relationship to the conduct of the state's business" are outside of the scope of employment. *Oye*, supra, at ¶ 7.

{¶ 34} In cases such as this, determining whether a health care practitioner is within the "scope of employment" is particularly difficult given the dual nature of the practitioner's employment.[2] On one hand, the practitioner is a university faculty member, charged by the university with furthering the education of students and residents in a real-world setting. On the other hand, the practitioner is the patient's caregiver, providing treatment for compensation from a private practice plan. In many instances, the line between these two roles is blurred because the practitioner may be teaching by simply providing the student or resident an opportunity to observe while the practitioner treats a patient. In this situation, is the practitioner acting within the scope of his employment with the state or his private employer?

{¶ 35} Since *Katko v. Balcerzak* (1987), 41 Ohio App.3d 375, 536 N.E.2d 10, this court has struggled with identifying the appropriate analysis for resolving this issue. In our earlier cases, we reasoned that a practitioner was acting within the scope of employment for whichever employer had the most significant financial involvement in the provided treatment. Thus, our analysis centered primarily upon financial factors, i.e., whether the university or the practice plan paid the practitioner for his services, whether the university or the practice plan billed and collected payment from the patient for the practitioner's services, whether the university or the practice plan received the greater financial gain from the practitioner's services, and whether the university or the practice plan insured the practitioner for malpractice. See, e.g., *Balson v. Ohio State Univ.* (1996), 112

---

appellees here do not allege that the practitioners acted in such a manner and, thus, we need not address that issue.

2. Appellees argue that practitioners who are so dually employed are guilty of soliciting improper compensation, in violation of R.C. 2921.43. We do not address the merits of this argument because it is irrelevant to the sole controversy before us—whether the practitioners are immune from liability.

Ohio App.3d 33, 677 N.E.2d 1216; *Harrison v. Univ. of Cincinnati Hosp.* (June 28, 1996), Franklin App. No. 96API01–81, 1996 WL 362055.

{¶ 36} In each of the cases that focused upon financial factors in determining whether the practitioner was within the scope of employment with the state university at the time of the alleged wrongful act, the result was the same: the practitioner was not immune. Generally, we reached this result because the private practice plan typically had significantly greater financial involvement in the provided care. Most, if not all, Ohio state medical schools affiliate with separate corporations run and staffed by clinical faculty members to deal with the income generated from the clinical faculty members' practices. These corporations, or practice plans, employ the medical school clinical faculty and provide the majority of the clinical faculty members' salaries. Additionally, the practice plans are responsible for billing and collecting payments for the services the clinical faculty members provide as part of their practice of medicine. Often, the practice plans also provide the practitioner's malpractice insurance.

{¶ 37} The universities benefit in two ways from this arrangement. First, without tapping university funds, the medical schools are able to attract highly regarded clinical faculty members with salaries comparable to those offered in the private sector. Students and residents then benefit from working with these clinical faculty members, learning to practice medicine by observing and assisting them in the treatment of patients. Second, the medical schools receive contributions from the practice plans, allowing them to maintain their departments.

{¶ 38} Although medical schools exercise a high degree of control over these practice plans and benefit from their profitability, the schools themselves have little direct involvement with the financial aspects of the practice of medicine. Therefore, the use of the financial factors to determine whether a practitioner is within the scope of his employment with the medical school will almost always result in a negative answer. Furthermore, the financial factors generally do not address the core scope of employment issue: whether the practitioner was acting to further the medical school's interests.

{¶ 39} Beginning with *Norman v. Ohio State Univ. Hosps.* (1996), 116 Ohio App.3d 69, 686 N.E.2d 1146, we introduced a new factor into the scope of employment analysis: whether the practitioner saw the patient only in the course of supervising or instructing a resident (the "education" factor). If a practitioner, as the physician in *Norman,* treated the patient only as part of his duty to oversee and direct residents, then it was more likely that the patient was a patient of the university, not a private patient of the physician. Id. at 77, 686 N.E.2d 1146. When a practitioner was treating a private patient, he was acting outside of the scope of his employment with the university. Conversely, a practitioner treating a patient of the university was acting within the scope of his

employment. See, also, *Chitwood v. Univ. Med. Ctr.* (May 5, 1998), Franklin App. No. 97API09–1235, 1998 WL 226938 (holding that a physician was immune because he saw the patient in his capacity as the on-call physician supervising residents rather than as a private patient).

{¶ 40} In an attempt to synthesize this new factor with the financial factors, we articulated a two-part test in *Kaiser v. Flege* (Sept. 22, 1998), Franklin App. No. 98AP–146, 1998 WL 655392. There, we held:

The two major determining factors to be used in finding whether a physician was acting outside the scope of his or her employment for a state university hospital are: (1) whether the patient was a private patient of the physician, rather than a patient of the university; and (2) the university's financial gain from the medical treatment at issue relative to the physician's financial gain therefrom.

{¶ 41} Although this test properly summarized the factors we had previously used to determine whether a practitioner was acting within the scope of his employment, the test did not render a predictable result. Rather, the outcome of each case depended upon which factor we stressed.

{¶ 42} This lack of predictability quickly became apparent and is illustrated in *Scarberry,* supra, 1998 WL 831578, decided less than three months after *Kaiser.* The majority in *Scarberry* determined that the physician was immune because he was acting within the scope of his employment when he treated the patient in conjunction with a resident, whom he was supervising. Notably, the majority's analysis of the physician's employment status did not turn upon the financial factors. The dissent, however, concentrated almost solely upon the financial factors and concluded that the physician should *not* be immune because the financial factors weighed against him. The dissent pointed out that the practice plan billed the patient and provided the physician with malpractice coverage. Further, the physician earned over three-quarters of his salary from the practice plan and received no compensation from the university for the services he rendered to the patient. As we previously pointed out, such business arrangements are typical between state universities and private practice plans.

{¶ 43} In *Ferguson v. Ohio State Univ. Med. Ctr.* (June 22, 1999), Franklin App. No. 98AP–863, 1999 WL 410247, we took a somewhat different tack. In *Ferguson,* we concluded that "[w]hile billing may be a relevant factor in determining whether the physician is acting within the scope of his state employment, it may not always be the determinative factor." Rather, the "key issue" was whether the practitioner "saw the patient only in his capacity as an attending physician supervising residents" or whether the practitioner "saw the patient as a private patient." Thus, although we listed the 15 factors that this court had historically examined in determining whether a practitioner was acting within the

scope of employment, our holding in *Ferguson* elevated the education factor as the paramount factor in the analysis.

{¶ 44} With the exception of *Smith,* supra,[3] the cases following *Ferguson* turned upon the education factor. When evidence existed that a practitioner was supervising or instructing students or residents while rendering care to the patient, we concluded that the practitioner was acting within the scope of his employment. See, e.g., *Hopper v. Univ. of Cincinnati* (Aug. 3, 2000), Franklin App. No. 99AP–787, 2000 WL 1059672; *Barkan v. Ohio State Univ.,* Franklin App. No. 02AP–436, 2003-Ohio-985, 2003 WL 754349. However, when the parties presented no evidence of supervision or instruction of a student or resident, we fell back upon a review of the financial factors to support a finding that the practitioner was acting outside of the scope of his employment. See, e.g., *Lynd v. Univ. of Cincinnati* (Nov. 23, 1999), Franklin App. No. 99AP–37, 1999 WL 1054824; *Wayman v. Univ. of Cincinnati Med. Ctr.* (June 22, 2000), Franklin App. No. 99AP–1055, 2000 WL 798797.

{¶ 45} In *Kaiser v. Ohio State Univ.,* Franklin App. No. 02AP–316, 2002-Ohio-6030, 2002 WL 31466409, one of our most recent cases, we reiterated the unimportance of the financial factors and focused instead upon the education factor. Recognizing that the financial aspects of each case remained virtually the same, we concluded that "it was the facts surrounding the actual treatment of the patient which served as the critical basis" for determining whether the practitioner was outside of the scope of employment. Id. at ¶ 15. Thus, whether a practitioner was acting outside the scope of his employment was dependent upon the degree to which the practitioner took care of the patient independently of his duties as a practitioner supervising the work of a resident. Id. at ¶ 25.

{¶ 46} As the above discussion demonstrates, since *Ferguson,* this court has implicitly and explicitly retreated from applying the financial factors as determinative factors and, instead, the outcome of each case essentially has turned upon the education factor. Therefore, we conclude that although the financial factors may be relevant to determine whether a practitioner is an employee of the state, the financial factors generally have little bearing upon whether a practitioner is acting within the scope of his employment. Instead, to determine whether a practitioner is acting within the scope of employment, the

---

**3.** In *Smith,* supra, 2001 WL 1512098, the plaintiff alleged that a physician was negligent in positioning him during surgery. Although a fellow and resident were present while the physician operated on the plaintiff, this court held that the physician was not acting within the scope of his employment for immunity purposes. Rather, we concluded that the physician was outside of the scope of his employment because the physician's practice plan billed and collected payment for the treatment, the patient was treated at a private hospital, and the physician received compensation and benefits from the practice plan.

Court of Claims must primarily inquire whether the practitioner was educating a student or resident while rendering the allegedly negligent care to the patient. If the practitioner was educating a student or resident, then the practitioner was acting within the scope of his employment and, thus, is immune from liability.

{¶ 47} Making the education of students and residents the primary factor is consistent with the general definition of "scope of employment." As reflected by testimony, employment contracts, letters of appointment, and other evidence, the "master's business" in these cases is the education of students and residents in a real-world setting.[4] Therefore, any time a clinical faculty member furthers a student or resident's education, he promotes the state's interest. Because the state's interest is promoted no matter how the education of the student or resident occurs, a practitioner is acting within the scope of his employment if he educates a student or resident by direct instruction, demonstration, supervision, or simple involvement of the student or resident in the patient's care.

{¶ 48} Accordingly, in order to determine whether a practitioner is acting within the scope of his employment, the Court of Claims must first identify the aspect of the course of treatment that the plaintiff alleges gave rise to damage or injury. Then, if education is the university's interest, the Court of Claims must determine whether a student or resident was somehow involved with the patient's care during that aspect of the course of treatment. Thus, for example, if during a patient's visit to the emergency room a physician is negligent, that physician was acting within the scope of his employment, and is immune, if a resident or student was involved in the patient's treatment during that visit. *Kaiser v. Flege*, supra, 1998 WL 655392; *Barkan*, supra, 2003-Ohio-985.

{¶ 49} Notably, the degree of the student or resident's involvement is not significant in this analysis as long as the practitioner was teaching at the time of the alleged wrongful act. Further, it is irrelevant how the patient views his relationship with the practitioner.

{¶ 50} In the case at bar, UC introduced evidence that a student and at least three residents were involved with Theobald's treatment. However, in determining that the practitioners were not acting within the scope of their employment, the Court of Claims did not concentrate on this evidence but, instead, relied solely upon the financial factors. Therefore, we must remand this case to the Court of Claims for it to make a determination whether a student or

---

4. For example, Dr. Taha's November 1, 1996 letter of appointment states that his faculty responsibilities included instructing residents in the operating room, on rounds, and in other teaching formats. Further, Dr. Taha testified that UC's main requirement of him was to teach residents how to be good neurosurgeons.

resident was involved during each aspect of Theobald's course of treatment that allegedly resulted in appellees' damages and injuries.

{¶ 51} Accordingly, we sustain UC's fourth through sixth assignments of error to the extent that the Court of Claims erred in determining whether the physicians were acting within the scope of their employment without considering whether students or residents were involved in each aspect of the course of treatment during which appellees allege they were damaged and injured. Further, we sustain UC's seventh assignment of error to the extent that the Court of Claims failed to make any determination regarding whether Nurse Parrott was acting within her scope of employment.

{¶ 52} For the foregoing reasons, we overrule UC's first assignment of error and sustain UC's second and third assignments of error. Further, we sustain UC's fourth, fifth, sixth, and seventh assignments of error to the extent noted above. Finally, we reverse the Court of Claims of Ohio's judgment and remand this cause to that court for further proceedings in accordance with law and this opinion.

Judgment reversed
and cause remanded.

PEGGY BRYANT and SADLER, JJ., concur.