THEOBALD ET AL., APPELLANTS, *v.* UNIVERSITY OF CINCINNATI, APPELLEE.

[Cite as *Theobald v. Univ. of Cincinnati,*
111 Ohio St.3d 541, 2006-Ohio-6208.]

(No. 2005–0896—Submitted March 28, 2006—Decided December 13, 2006.)

LUNDBERG STRATTON, J.

{¶ 1} The issue before us involves personal immunity from liability, pursuant to R.C. 9.86 and 2743.02(F), of a physician or other health-care practitioner who is employed by a state facility and in the private sector. The court of appeals remanded the matter to the Court of Claims to determine whether the health-care practitioners who allegedly injured the plaintiff were acting within the scope of their state employment by educating a resident or student at the time of the injury. For the following reasons, we affirm the judgment of the court of appeals.

{¶ 2} Plaintiff-appellant, Keith Theobald, was seriously injured in an automobile accident. He was taken to University Hospital in Cincinnati. Dr. Frederick A. Luchette was the attending trauma surgeon on duty who admitted and began treating Theobald. Dr. Luchette contacted the neurotrauma department, and Theobald's care was assigned to Dr. Jamal Taha, the interim director of the hospital's neurotrauma team. Because of the extent of Theobald's injuries, Dr. Taha involved Dr. Andrew J. Ringer, the hospital's chief neurotrauma resident. They decided that surgery was necessary, so Dr. Taha and Dr. Ringer met with the Theobalds to obtain their consent to the surgery.

{¶ 3} Prior to the surgery, a student nurse anesthetist, Amy Wehrman, prepared a preanesthesia note setting forth Theobald's history and physical condition. Maureen Parrott, a certified registered nurse anesthetist, reviewed Wehrman's note and discussed the plan for administering anesthesia during the surgery with Wehrman and Dr. Harsha Sharma, the anesthesiologist.

{¶ 4} Theobald underwent ten hours of surgery in which Dr. Luchette, assisted by Dr. Steven Giss, a trauma resident, opened and closed the incision, and Dr. Taha, assisted by Dr. Ringer, performed the neurosurgical procedure. Dr.

Sharma and Parrott, assisted by Wehrman, administered the anesthesia and monitored Theobald's condition.

{¶ 5} When Theobald awoke, he could not see, he had lost the use of his right arm, and he had little mobility in his left arm. In October 1999, Theobald and his wife, Jacqueline, individually and on behalf of their two minor children, filed an action for medical malpractice in the Hamilton County Court of Common Pleas against Dr. Luchette, Dr. Taha, Dr. Sharma, and Parrott, among others, in which they alleged that these defendants were negligent in providing medical care to Theobald during and after his surgery. These four defendants, who claimed that they were state employees, asserted the defense of personal immunity pursuant to R.C. 9.86.

{¶ 6} The common pleas court stayed the malpractice action to allow the Court of Claims to determine whether the defendants were entitled to immunity. Pursuant to R.C. 2743.02(F), the Theobalds filed an action in the Court of Claims against the University of Cincinnati to determine the issue of the four defendants' personal immunity. The Court of Claims allowed the defendants to join the proceedings, and then conducted a hearing to determine whether they were immune from suit as state employees.

{¶ 7} On April 23, 2002, the Court of Claims concluded that the defendants were not entitled to personal immunity. The court determined that Dr. Luchette and Dr. Sharma were employed by the state but that they were acting outside the scope of their employment when they treated Theobald because their private-practice plans had billed the Theobalds and received the money from the services rendered, and Theobald was treated at a private hospital. The Court of Claims also concluded that Dr. Taha and Parrott were not state employees because they worked for and were paid by private corporations that merely contracted with the state. The University of Cincinnati appealed.[1]

{¶ 8} The Tenth District Court of Appeals concluded that all four individuals were employed by the state and reversed and remanded for the Court of Claims to reconsider whether each one was acting manifestly outside the scope of employment when the alleged negligence occurred. See R.C. 9.86. The appellate court disagreed with the Court of Claims' examination of the issues based only on the financial factors. The court reasoned that if the state's interest is promoted when a health-care practitioner furthers the education of students and

---

1. The individuals attempted to appeal the Court of Claims' decision. The Tenth District Court of Appeals dismissed the appeals on the basis that the individuals lacked standing. We affirmed, citing *Johns v. Univ. of Cincinnati Med. Assoc., Inc.*, 101 Ohio St.3d 234, 2004-Ohio-824, 804 N.E.2d 19, holding that "a state employee has no right to participate in the immunity determination proceedings before the Court of Claims or to appeal that determination." *Theobald v. Univ. of Cincinnati*, 101 Ohio St.3d 370, 371, 2004-Ohio-1527, 805 N.E.2d 1084.

residents, then the Court of Claims had to determine whether the practitioner was educating a student when the alleged negligence occurred.

{¶ 9} Thus, the appellate court instructed the Court of Claims to identify what the practitioner was doing when the alleged injury occurred and whether the practitioner was advancing the state's interest at the time. The Theobalds appealed.

{¶ 10} This cause is before this court upon our acceptance of a discretionary appeal.

### Personal Immunity for State Employee

{¶ 11} The issue of personal immunity of a state employee is governed by the application of R.C. 9.86 and R.C. 2743.02(F). R.C. 9.86 provides:

{¶ 12} "Except for civil actions that arise out of the operation of a motor vehicle and civil actions in which the state is the plaintiff, no officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner."

{¶ 13} The Court of Claims has exclusive, original jurisdiction to determine whether a state employee is personally immune from liability in a civil action under R.C. 9.86 or whether the conduct was manifestly outside the scope of employment at the time the cause of action arose.[2] R.C. 2743.02(F); *Johns v. Univ. of Cincinnati Med. Assoc., Inc.*, 101 Ohio St.3d 234, 2004-Ohio-824, 804 N.E.2d 19. If the Court of Claims determines that the state employee is immune from personal liability under R.C. 9.86, the claimant must assert his or her claims against the state and the state shall be liable for the employee's acts or omissions. R.C. 2743.02(A)(2).

{¶ 14} Thus, the Court of Claims' analysis of personal immunity has two parts: Was the individual a state employee, and if so, was the individual acting within the scope of employment when the cause of action arose? The Theobalds have not appealed the appellate court's holding that these individuals were state employees for purposes of R.C. 9.86. A "state employee," for purposes of R.C. 9.86, is defined in R.C. 109.36(A)(1) as a "person who, at the time a cause of action against the person arises, is * * * employed by the state." Thus, the issue before us involves the second part of the immunity analysis. Although the issue of personal immunity is a question of law, whether an individual acted manifestly

---

2. Consequently, all decisions that are appealed from the Court of Claims are within the exclusive jurisdiction of the Tenth District Court of Appeals. Both courts are located in Columbus, Ohio.

outside the scope of employment is a question of fact. *Hopper v. Univ. of Cincinnati* (Aug. 3, 2000), Franklin App. No. 99AP–787, 2000 WL 1059672.

{¶ 15} The Revised Code does not define "scope of employment." The concept generally denotes an agency relationship in which the agent or employee is engaged in an activity that is logically related to the business of the principal or employer. See *Ruckman v. Cubby Drilling, Inc.* (1998), 81 Ohio St.3d 117, 120, 689 N.E.2d 917; *Posin v. A.B.C. Motor Court Hotel, Inc.* (1976), 45 Ohio St.2d 271, 278, 74 O.O.2d 427, 344 N.E.2d 334. For purposes of personal immunity under R.C. 9.86, a state employee acts within the scope of employment if the employee's actions are "in furtherance of the interests of the state." *Conley v. Shearer* (1992), 64 Ohio St.3d 284, 287, 595 N.E.2d 862. Thus, a state employee's duties should define the scope of employment.

### Dual Employment

{¶ 16} A health-care practitioner who has dual status as a private practitioner and as an employee of a state medical institution is potentially immune from liability for medical malpractice only when he or she is performing duties for the state. Unless he or she acted "with malicious purpose, in bad faith, or in a wanton or reckless manner" or manifestly outside the scope of employment, the state employee is not liable for injury caused in the performance of those duties. R.C. 9.86. Because of this dual nature, courts have struggled to identify an appropriate analysis of the scope of employment for purposes of personal immunity. "In many instances, the line between these two roles is blurred because the practitioner may be teaching by simply providing the student or resident an opportunity to observe while the practitioner treats a patient." *Theobald v. Univ. of Cincinnati*, 160 Ohio App.3d 342, 2005-Ohio-1510, 827 N.E.2d 365, at ¶ 34.

{¶ 17} In early cases, courts analyzed billing procedures and other financial factors, including the comparison of a practitioner's financial gain with the university's financial gain from the medical treatment. *Katko v. Balcerzak* (1987), 41 Ohio App.3d 375, 536 N.E.2d 10; *York v. Univ. of Cincinnati Med. Ctr.* (Apr. 23, 1996), Franklin App. Nos. 95API09–1117 and 95API09–1127, 1996 WL 200324; *Kaiser v. Flege* (Sept. 22, 1998), Franklin App. No. 98AP–146, 1998 WL 655392. The courts reasoned that if the state directly received the financial benefits from the medical services rendered, or if it received a greater proportion of the fee than did the individual practitioner, then the practitioner was acting within the scope of employment for the state.

{¶ 18} In *Norman v. Ohio State Univ. Hosp.* (1996), 116 Ohio App.3d 69, 77, 686 N.E.2d 1146, however, the court expanded its analysis to examine the physician's relationship with the patient in addition to the university's financial benefit from the medical treatment at issue. The court in *Norman* concluded

that the plaintiff was a patient of the university clinic and saw the defendant-physician only while he was on call as part of his duties as a faculty member. In addition, the court said that the university received most of the physician's fee for the medical services. Therefore, the court concluded that the physician's conduct was within the scope of his employment with the state at the time the patient was allegedly injured, and thus he was entitled to personal immunity from liability.

{¶ 19} In *Ferguson v. Ohio State Univ. Med. Ctr.* (June 22, 1999), Franklin App. No. 98AP–863, 1999 WL 410247, the court further explained that billing may be relevant but does not always determine when a practitioner is acting within the scope of employment with the state. Instead, the court said that the key issue in the question of personal immunity is whether the physician "saw the patient only in his capacity as an attending physician supervising residents * * * or whether he saw the patient as a private patient." In *Ferguson*, although the physician's private medical corporation billed the plaintiff for his services, the plaintiff's only contact with the physician was as the attending physician supervising the resident who treated the plaintiff. Thus, the court concluded that the physician was acting within the scope of his employment with the state, and he was entitled to personal immunity.

{¶ 20} Following *Ferguson*, the court of appeals began to focus on the physician's role at the time of the treatment and to place less emphasis on the financial factors. For example, in *Hopper v. Univ. of Cincinnati*, supra, Franklin App. No. 99AP–787, 2000 WL 1059672, the court concluded that the physician's conduct was within the scope of employment as a state employee and thus the physician was entitled to personal immunity because he was supervising residents while treating the patient. In *Kaiser v. Ohio State Univ.*, Franklin App. No. 02AP–316, 2002-Ohio-6030, 2002 WL 31466409, a resident treated the plaintiff. The attending physician was only minimally involved in the plaintiff's care. The court concluded that the attending physician acted as a supervisor and thus was entitled to personal immunity from liability because he was acting within the scope of his state employment.

{¶ 21} The Theobalds ask us to adopt a bright-line test based on a health-care practitioner's billing practices to determine whether the practitioner's actions were manifestly outside the scope of employment. They argue that if the patient directly pays the practitioner, not the state, for the medical treatment at issue, then the practitioner was privately employed at the time of treatment and consequently was manifestly outside the scope of employment for purposes of R.C. 9.86.

{¶ 22} The court of appeals faulted that approach, stating that the financial factors "generally have little bearing upon whether a practitioner is acting within the scope of his employment." *Theobald*, 160 Ohio App.3d 342, 2005-Ohio-1510,

827 N.E.2d 365, at ¶ 46. This is because, as the court of appeals explained, "[m]ost, if not all, Ohio state medical schools affiliate with separate corporations run and staffed by clinical faculty members to deal with the income generated from the clinical faculty members' practices. These corporations, or practice plans, employ the medical school clinical faculty and provide the majority of the clinical faculty members' salaries. Additionally, the practice plans are responsible for billing and collecting payments for the services the clinical faculty members provide as part of their practice of medicine." Id. at ¶ 36. This arrangement allows universities to attract and compensate highly qualified clinical instructors while the practice groups or corporations, in turn, financially contribute to maintain the medical departments within the university. Id. at ¶ 37.

{¶ 23} We agree with the court of appeals. The financial factors may be relevant to the practitioner's status as a state employee; however, they do not necessarily establish whether he or she was within the scope of that employment at the time a cause of action arose. Instead, the question of scope of employment must turn on what the practitioner's duties are as a state employee and whether the practitioner was engaged in those duties at the time of an injury. Thus, proof of the content of the practitioner's duties is crucial. The Court of Claims must have evidence of those duties before it can be determined whether the actions allegedly causing a patient's injury were "in furtherance of the interests of the state" or, in other words, within the scope of employment.

{¶ 24} In this case, the court of appeals concluded that the practitioner's duties included the education of students and residents. The court thus instructed the Court of Claims to "first identify the aspect of the course of treatment that the plaintiff alleges gave rise to damage or injury," then to "inquire whether the practitioner was educating a student or resident while rendering the allegedly negligent care to the patient." Id. at ¶ 46, 48.

{¶ 25} We believe that this approach follows the language and intent of R.C. 9.86 and correctly focuses upon the purpose of the employment relationship, not on the business or financial arrangements between the practitioner and the state. R.C. 9.86 is inclusive and makes no exception for persons who may simultaneously have other employment interests. It provides immunity for all state employees as long as they are acting within the scope of their employment when the injury occurs.

{¶ 26} Courts have applied this approach and determined that the practitioner is entitled to immunity. In *Kaiser v. Ohio State Univ.*, Franklin App. No. 02AP–316, 2002-Ohio-6030, 2002 WL 31466409, the plaintiff was admitted to the university's hospital through the emergency room. A resident treated the plaintiff; the attending physician briefly saw the plaintiff while supervising the resident. The court concluded that the attending physician was involved in a

supervisory role only and therefore, he was acting within the scope of state employment and entitled to personal immunity under R.C. 9.86.

{¶ 27} In *Hans v. Ohio State Univ. Med. Ctr.*, Ct. of Cl. No. 2001–10140, 2005-Ohio-4457, 2005 WL 2065139, the defendant was a member of the Ohio State University's medical school faculty and was also engaged in the private practice of medicine. The plaintiff's personal physician referred him to Ohio State University for surgery. The defendant operated on the plaintiff at the university's hospital in the presence of a resident. The Court of Claims, applying *Theobald*, 160 Ohio App.3d 342, 2005-Ohio-1510, 827 N.E.2d 365, determined that the defendant had acted within the scope of employment when the alleged injury occurred because a resident was observing him perform the surgery.

{¶ 28} However, if an employee's actions are self-serving or have no relationship to the employer's business, then the conduct is "manifestly outside the scope of employment," and R.C. 9.86 does not apply. *Byrd v. Faber* (1991), 57 Ohio St.3d 56, 59, 565 N.E.2d 584; *Hidey v. Ohio State Hwy. Patrol* (Sept. 22, 1998), Franklin App. No. 97API12–1587, 1998 WL 655277. For example, in *Johnson v. Univ. of Cincinnati*, Franklin App. No. 04AP–926, 2005-Ohio-2203, 2005 WL 1055906, the defendants were employed by the university's medical school as faculty members and also conducted a clinical practice in which they supervised residents who rotated through the medical center. The defendants treated the plaintiff at the clinic, but no resident or student was present at the time. Consequently, the court concluded that the physicians treated the plaintiff in their private practice, outside the scope of their state employment, and that they were not entitled to personal immunity under R.C. 9.86.

{¶ 29} In *Wayman v. Univ. of Cincinnati Med. Ctr.* (June 22, 2000), Franklin App. No. 99–AP–1055, 2000 WL 798797, the defendant was on the faculty of the university's medical school and was also a member of a practice plan. The defendant treated the plaintiff on several occasions at the offices of the practice plan but did not see her while teaching at the hospital. The court concluded that the defendant had treated the plaintiff as a private patient at his own office, not at the university facility, and that his practice plan had billed for and received the proceeds from his services. Thus, the defendant was not acting within the scope of his employment with the university at the time and was not entitled to personal immunity from liability.

{¶ 30} Therefore, in an action to determine whether a physician or other health-care practitioner is entitled to personal immunity from liability pursuant to R.C. 9.86 and 2743.02(A)(2), the Court of Claims must initially determine whether the practitioner is a state employee. If there is no express contract of employment, the court may require other evidence to substantiate an employment relationship, such as financial and corporate documents, W–2 forms, invoices, and

other billing practices. If the court determines that the practitioner is not a state employee, the analysis is completed and R.C. 9.86 does not apply.

{¶ 31} If the court determines that the practitioner is a state employee, the court must next determine whether the practitioner was acting on behalf of the state when the patient was alleged to have been injured. If not, then the practitioner was acting "manifestly outside the scope of employment" for purposes of R.C. 9.86. If there is evidence that the practitioner's duties include the education of students and residents, the court must determine whether the practitioner was in fact educating a student or resident when the alleged negligence occurred.

{¶ 32} The Theobalds also ask us to require a health-care practitioner to obtain informed consent from a patient, except in emergency situations, in order to assert the defense of personal immunity under R.C. 9.86. The statute does not require informed consent, and we will not read such a requirement into the statute. Instead, the Theobalds should direct this argument to the General Assembly.

{¶ 33} The Theobalds did not appeal the issue of the individuals' status as state employees, and thus these conclusions are now the law of the case. The court of appeals' remand is limited to the determination of whether the individuals were acting within the scope of their state employment when Theobald was injured.

{¶ 34} We affirm the judgment of the court of appeals.

Judgment affirmed.

MOYER, C.J., RESNICK, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

PFEIFER, J., dissents.

---

**PFEIFER, J., dissenting.**

{¶ 35} The majority opinion appears wholly concerned with how the scope-of-employment issue affects medical practitioners. Although that concern is appropriate, it should be tempered by at least a suggestion that the concerns of the plaintiff have been considered. The plaintiff in this case is the one who has been grievously injured, not the various doctors and nurses.

{¶ 36} In a case such as this, the doctors will ultimately be determined to be responsible, not responsible, or immune. In any event, the doctors will not suffer unduly; any financial liability they incur will be covered by insurance. The same cannot be said for the plaintiff. If Theobald does not prevail, the lengthy delay will not have prejudiced him. But if he does prevail, the delays will have deprived him of several years during which the money he ultimately receives could have alleviated some of the unfortunate consequences of the negligence he

suffered. The plaintiff is already seven years into this litigation, and, even after today's decision, he still does not know which court he should be in.

{¶ 37} The majority opinion does not address the plight of plaintiffs who feel (reasonably) that they must file two lawsuits (one in the Court of Claims and one in the court of common pleas) because it is so difficult to determine which venue is proper. See *Johns v. Univ. of Cincinnati Med. Assoc., Inc.*, 101 Ohio St.3d 234, 2004-Ohio-824, 804 N.E.2d 19. The concern about dual filings is heightened when, as here, multiple doctors are involved because the chances that one of them is a teaching doctor (perhaps entitled to immunity) are greater. This is a nightmare scenario for a plaintiff. When in the Court of Claims, the doctor accused of negligence will be pointing at the empty chair—that is, at the doctor who is susceptible to suit only in the court of common pleas. And when in the court of common pleas, the doctor accused of negligence will be pointing at a different empty chair—at the doctor who is only susceptible to suit in the Court of Claims. This concern is general and not specific to this case, in which it appears that the anesthesiologist is the person most likely to have committed negligence.

{¶ 38} The new test set forth by the majority opinion apparently immunizes a doctor from negligence whenever negligence occurs in the presence of a student. This test is imbued with the fiction that teaching doctors are always teaching. I have the utmost respect for the medical practitioners in this state. Countless Ohioans have been well treated through the years. But doctors are busy professionals, often called upon to make irreversible decisions of the utmost magnitude with little time for reflection, and they make mistakes. When they do, whether they are immune from liability should not depend solely on whether a student is present. Teaching by osmosis is not the same as talking a resident through an operation. The mere presence of a student does not establish that instruction is taking place.

{¶ 39} The facts of this case suggest that, to the extent any teaching was taking place, it was purely incidental. Theobald had been in a terrible automobile accident. He was under considerable physical stress, and the doctors were under considerable mental stress. They needed to act quickly, and they needed to perform at the highest professional level. They had neither the time nor the inclination to teach—they were trying to save a life and as much bodily functioning as possible. In that situation, teaching is not a priority or even a consideration. But under the test set forth today, our state's highly skilled and trained teaching doctors will be encouraged to make sure a student is available every time they operate. After all, would there be any better way to avoid personal liability for negligence?

{¶ 40} The quest for a simple rule should not override logic. Teaching doctors are not always teaching, even when a student is present. Teaching doctors serve two masters—their patient and the university for whom they have agreed to teach. We should not so easily adopt a rule that declares that one of the masters is always dominant. The former rule used by the court of appeals, which focused on financial factors, seems to strike a better balance between the two masters. It allowed judges to determine whether a doctor was serving his or her own interests or those of the state based on a variety of factors. That is as it should be. A doctor who is one percent teaching and 99 percent engaged in private practice for profit should not automatically be granted immunity based on that nominal amount of teaching. Having a student look over his or her shoulder during surgery should not immunize a doctor from personal liability. At the same time, when a doctor is involved in substantive teaching, for example, by guiding a resident doctor through a complicated (or even relatively simple) procedure, the situation is radically different and the teaching doctor should be entitled to immunity.

{¶ 41} Another far-reaching consideration of which the majority opinion appears unaware is cost-shifting. Every time a doctor is granted immunity because he or she is teaching, even if that teaching is incidental, the burden of his or her negligence is transferred to the state. Such a profound change in policy ought not to be arrived at lightly—it should at least be addressed. The real beneficiaries of this cost-shifting are insurance companies because they will pay on fewer claims. And they likely won't reduce premiums because they cannot know in advance whether any future negligence will occur in the presence of a student.

{¶ 42} This cost-shifting policy change could have been effected by the General Assembly; it has thus far chosen not to do so. But now, the University of Cincinnati, a state entity, wants to have it both ways. (Despite its name, University Hospital is privately owned.) In this case, which was originally filed in 1999, the university argues that teaching during an operation, however incidental the teaching, is within the scope of employment, and, therefore, that its teaching doctors are immune from personal liability. In *Johns*, 101 Ohio St.3d 234, 2004-Ohio-824, 804 N.E.2d 19, which was also originally filed in 1999, the university made the opposite argument. It stipulated in the Court of Claims that the doctor sued in that case was acting outside the scope of his state employment, even though that doctor supervised an operation that "was primarily performed by a third-year resident." Id. at ¶ 3. For the state to argue contrary positions in two cases that were filed at the same time concerning similar issues is at best unhelpful and at worst unconscionable. The state ought to be serving the interests of justice, not subverting them.

{¶ 43} Finally and most important, the majority opinion also fails to consider the issue of a jury trial. When the state is a defendant (as it would be, based on this opinion, whenever a student is present when a teaching doctor commits negligence), no jury trial is allowed in the Court of Claims. R.C. 2743.03(C)(1) and 2743.11. By forcing more cases to the Court of Claims, this opinion effectively prohibits plaintiffs from asserting their fundamental constitutional right to a trial by jury. Section 5, Article I of the Ohio Constitution ("The right to a trial by jury shall be inviolate * * *"). See *Arrington v. DaimlerChrysler Corp.*, 109 Ohio St.3d 539, 2006-Ohio-3257, 849 N.E.2d 1004 (Pfeifer, J., dissenting); *State ex rel. Russo v. McDonnell*, 110 Ohio St.3d 144, 2006-Ohio-3459, 852 N.E.2d 145 (Pfeifer, J., dissenting).

{¶ 44} I dissent.

---

James P. Sullivan and Douglas C. Holland, for appellants.

Jim Petro, Attorney General, Douglas R. Cole, State Solicitor, and Stephen P. Carney, Senior Deputy Solicitor, for appellee.

Jerome A. McTague, urging affirmance for amicus curiae, Medical College of Ohio Physicians.