[Cite as *Poe v. Univ. of Cincinnati*, 2012-Ohio-6335.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

SHARON POE, Admr., etc.

     Plaintiff

     v.

UNIVERSITY OF CINCINNATI

     Defendant

Case No. 2010-11340

Judge Clark B. Weaver Sr.

JUDGMENT ENTRY

{¶ 1} An evidentiary hearing was conducted in this matter to determine whether Michael Canady, M.D., is entitled to civil immunity pursuant to R.C. 2743.02(F) and 9.86.[1]  This case arises out of the medical treatment rendered to plaintiff's decedent, David Malone, in October 2008, at Holzer Medical Center in Gallipolis, Ohio.[2]

{¶ 2} Former R.C. 2743.02(F) states, in part:

{¶ 3} "A civil action against an officer or employee, as defined in section 109.36 of the Revised Code, that alleges that the officer's or employee's conduct was manifestly outside the scope of the officer's or employee's employment or official responsibilities, or that the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner shall first be filed against the state in the court of claims, which has exclusive, original jurisdiction to determine, initially, whether the officer or employee is entitled to personal immunity under section 9.86 of the Revised Code and whether the courts of common pleas have jurisdiction over the civil action."

---

[1] At the hearing, the court VACATED the May 7, 2012 judgment entry approving the parties' stipulation of immunity.

[2] Holzer Medical Center and Holzer Clinic merged in 2012 to become Holzer Health Systems.

{¶ 4} R.C. 9.86 states, in part:

{¶ 5} "[N]o officer or employee [of the state] shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner."

{¶ 6} "[I]n an action to determine whether a physician or other health-care practitioner is entitled to personal immunity from liability pursuant to R.C. 9.86 and 2743.02(A)(2), the Court of Claims must initially determine whether the practitioner is a state employee.  If there is no express contract of employment, the court may require other evidence to substantiate an employment relationship, such as financial and corporate documents, W-2 forms, invoices, and other billing practices.  If the court determines that the practitioner is not a state employee, the analysis is completed and R.C. 9.86 does not apply." *Theobald v. Univ. of Cincinnati*, 111 Ohio St.3d 541, 2006-Ohio-6208, ¶ 30.  "If the person claiming immunity is a state officer or employee, the second part of the analysis is to determine whether that person was acting within the scope of employment when the cause of action arose."  *Engel v. Univ. of Toledo College of Medicine*, 130 Ohio St.3d 263, 2011-Ohio-3375, ¶ 6, citing *Theobald, supra*.

{¶ 7} For purposes of R.C. 9.86 and 2743.02(F) 'officer or employee' must be defined in accordance with R.C. 109.36(A).  *State ex rel. Sanquily v. Court of Common Pleas of Lucas Cty.*, 60 Ohio St.3d 78 (1991).  R.C. 109.36(A)(1)(a) provides, in relevant part, that an employee is "[a] person who, at the time a cause of action against the person arises, is serving in an elected or appointed office or position with the state or is employed by the state."

{¶ 8} Dr. Canady, Chief of Surgery at the Holzer Medical Center, testified that in 2008, the Holzer Clinic was a physician-owned for-profit entity.  Dr. Canady, who

primarily practiced medicine in the Holzer Medical Center, was a shareholder and owner of the Holzer Clinic, which employed approximately 125 physicians.

{¶ 9} According to Dr. Canady, the Holzer Clinic and the University of Cincinnati (UC) have a long standing agreement whereby the Holzer Clinic trains and teaches residents while such residents are serving a two-month rotation from UC. John Cunningham, executive vice-president and chief administrative officer of Holzer Health Systems, testified that the relationship between the two entities began in the late 1940s and that it was eventually memorialized in writing and renewed on a routine basis. Dr. Canady became a signatory to the agreement in 2006. (Exhibit B.) The agreement in effect in 2008 is signed by Timothy Pritts, M.D., Ph.D., of University Hospital, Andrew Filak, Jr., M.D., of University Hospital/University of Cincinnati College of Medicine (UH/UCCOM), and Ronn Grandia, M.D., and T. Wayne Munro, M.D., both of the Holzer Clinic Department of Surgery. (Exhibit C.)

{¶ 10} The parties to the agreement are UH/UCCOM Department of Surgery, Residency Program in General Surgery and the Holzer Clinic Department of Surgery. (Exhibit C.) According to Dr. Canady, to facilitate the agreement, he and three other general surgeons within the department of surgery at the Holzer Clinic were appointed to positions as "voluntary assistant professors" in the department of surgery at UC. (Exhibit J.) They are referred to in the agreement as "surgical teaching faculty." (Exhibit C.)

{¶ 11} Dr. Canady testified that residents on rotation take "first call," which means that they are the first medical staff to see patients. Dr. Canady explained that this first call policy frees up Holzer Clinic physicians to see more patients in their private practice, which results in an increase of the total fee volume. Dr. Canady testified that in return for this benefit, UC residents working at the Holzer Medical Center are exposed to several types of medical procedures that the residents are otherwise unable to experience in the residency program. Consequently, the surgical teaching faculty benefits UC by providing residents with training on such procedures. For example,

residents receive training in laparoscopic suturing while they are on rotation at the Holzer Medical Center.  Additionally, Dr. Canady testified that the Holzer Clinic pays for the use of UC residents pursuant to minimal daily rates that are set by UC.  (Exhibit M.)

{¶ 12} The program letter of agreement provides that "[t]he goals and objectives for the rotation at [the Holzer Clinic] are attached to or described in Appendix A.  It is expected that the resident will attain the stated objectives through a supervised direct patient care experience, teaching rounds, and conferences presented by the attending staff at [the Holzer Clinic]."  (Exhibit C.)  Appendix A describes several achievement "units," each with corresponding competency-based knowledge and performance objectives.  The agreement further provides that "faculty at [Holzer Clinic] are responsible for the day-to-day activities of the Residents to ensure that the goals and objectives are met during the course of the educational experiences at [the Holzer Clinic].  All parties recognize that the program must be in full compliance with the ACGME[3] duty hour regulations and all other applicable accreditation requirements."  *Id.*

{¶ 13} Dr. Canady testified that residents on rotation at the Holzer Clinic perform both rounds and procedures while under the supervision of the faculty members at the Holzer Clinic;[4] that he, or another faculty member, meets with the assigned resident on a daily basis to discuss the surgical schedule and the level of responsibility the resident will assume for each procedure.  Midway through the two-month rotation, one of the faculty members meets with the resident to provide feedback and constructive criticism.  Dr. Canady testified that UC requires that the Holzer Clinic provide a written evaluation of the resident at the end of the two-month rotation.  The program letter of agreement specifically provides that "[t]he resident will have a written evaluation of his/her work while on rotation.  The evaluation form for this rotation will be provided by the Program Director. The evaluations will be completed by the aforementioned Local Director and

---

[1] Accreditation Council for Graduate Medical Education

[Holzer Clinic] faculty members and returned to the Program Director in a timely fashion upon resident/fellows completion of the assignment at [the Holzer Clinic]." *Id.*

{¶ 14} Dr. Canady testified that, on the day in question, Eric Campion, M.D., a resident on rotation from UC, participated in the laparoscopic procedure to place an adjustable gastric band on plaintiff's decedent's stomach. According to Dr. Canady, Dr. Campion obtained a formal medical history from plaintiff's decedent and admitted him to Holzer Medical Center. Dr. Canady asserted that Dr. Campion held the camera during the procedure and assisted in the surgical lap tying. Additionally, Dr. Canady instructed Dr. Campion about the procedure and demonstrated how to correctly hold the instruments during the procedure.

{¶ 15} In *Engel, supra,* the issue for the court was whether a physician who had been appointed to a non-paying faculty position at a state university could be considered either an officer or employee of the state for purposes of vicarious tort liability. The Supreme Court of Ohio found the following factors to be relevant in determining whether a physician is an officer or employee of the state: 1) contractual relationship between the state and the purported employee; 2) state control over actions of the purported employee; and 3) a symbiotic relationship between the entities.[5] *Id.* at ¶ 10-16. If the physician claiming immunity was not an employee of the state, then the court must determine whether the physician was "serving in an elected or appointed position with the state" within the meaning of R.C. 109.36(A)(1)(a). *Id.* at ¶ 17.

---

[4]Typically only one resident from UC is on rotation at the Holzer Clinic at any given time.
[5]Although *Engel* identified "payment by state for services of alleged employee" as a relevant factor, the Supreme Court expressly rejected the lack of payment for services as a dispositive factor. Instead, the court examined whether a "symbiotic relationship" existed. *Engel, supra,* at ¶ 15, citing *Potavin v. Univ. Med. Ctr.*, 10th Dist. No. 00AP-715 (Apr. 19, 2001).

**CONTRACTUAL RELATIONSHIP BETWEEN THE STATE AND THE PURPORTED EMPLOYEE**

{¶ 16} Applying the *Engel* factors herein, the court finds that Dr. Canady did have an employment contract with defendant.  Dr. Canady was an owner and shareholder of the Holzer Clinic, which contracted with UC to teach and train UC residents while on rotation at the Holzer Clinic.  The parties to the agreement are the Holzer Clinic and UH/UCCOM.  The purpose of the contract is to "identify the faculty who will assure the educational and supervisory responsibility for the residents/fellows; specify the responsibilities for teaching, supervision and formal evaluations of residents/fellows; specify the duration and content of the educational experience; and, state the policies and procedures that will govern resident education during the assignment."  (Exhibit C.) The presence of UC residents at the Holzer Clinic benefits Holzer by increasing fee income without the corresponding obligation to share all of such fee income with either UC or the resident.  In return, UC residents receive instruction and training in surgical procedures not typically performed at UC.  Furthermore, Dr. Canady received the benefit of having an appointment as an assistant professor in the UC Department of Surgery.  Accordingly, Dr. Canady had an employment contract with defendant.

**STATE CONTROL OVER ACTIONS OF PURPORTED EMPLOYEE**

{¶ 17} UC required "surgical teaching factulty" at the Holzer Clinic, which included Dr. Canady, to teach and train the residents.  Residents on rotation are "assigned to [the Holzer Clinic] for the period of eight (8) weeks."  *Id.*  The contract between the parties required Dr. Canady to provide residents with direct patient care training, teaching rounds, and faculty-conducted conferences.  The contract states that "[i]t is expected that the resident will attain the stated objectives through a supervised direct patient care experience, teaching rounds, and conferences presented by the attending staff at the [the Holzer Clinic]."  *Id.*

{¶ 18} The objectives of the rotation are attached to the contract as Appendix A. Appendix A, which UC provided to the Holzer Clinic, contains a detailed list of knowledge and performance-based objectives for three "units" entitled abdominal surgery, alimentary tract and digestive system, and liver biliary tract and pancreas. *Id.* The contract provides that "[i]n cooperation with the Program Director, Local Director and the faculty at [the Holzer Clinic] are responsible for the day-to-day activities of the Residents to ensure that the goals and objectives are met during the course of the educational experiences at [the Holzer Clinic]." *Id.*

{¶ 19} At the end of the rotation, Dr. Canady, or another faculty member, would submit an evaluation of the resident to UC. The contract provides that "[t]he resident will have a written evaluation of his/her work while on rotation. The evaluation form for this rotation will be provided by the Program Director. The evaluations will be completed by the aforementioned Local Director and participating site faculty members and returned to the Program Director in a timely fashion upon resident/fellows completion of the assignment at participating site." *Id.* Moreover, the contract required the Holzer Clinic to adhere to the duty hour regulation and other accreditation requirements of the ACGME. "All parties recognize that the program must be in full compliance with the ACGME duty hour regulations and all other applicable accreditation requirements." *Id.* Therefore, defendant had control over Dr. Canady's actions.

**SYMBIOTIC RELATIONSHIP BETWEEN THE ENTITIES**

{¶ 20} To determine whether a symbiotic relationship existed, in *Engel, supra*, the Supreme Court looked to *Potavin, supra.* In *Potavin*, the Tenth District Court of Appeals determined that a volunteer clinical instructor for UC's Department of Obstetrics and Gynecology (OBGYN) was an employee of the state. The court found that the volunteer clinical instructor's private practice plan contributed money to UC's OBGYN Department and that the private entity "would not exist if not for its relationship with UC, and that UC

could not pay its employees if not for its relationship with the practice [entity]." *Id.* at ¶ 29.

{¶ 21} Conversely, in *Engel*, the Supreme Court determined that a symbiotic relationship did not exist between defendant and the private entity that employed the physician whose immunity was at issue.[6] *Engel* involved a physician who was employed at a private hospital that was not affiliated with any state institution. The alleged negligence occurred while a third-year medical student, who was participating in a one-month clerkship from the University of Toledo, was observing the medical procedure. The Supreme Court noted that the parties' relationship was not a symbiotic one inasmuch as it only allowed for "students to rotate through [the physician's] practice as a part of one-month clerkships." *Engel, supra,* at ¶ 19. No other duties were imposed upon the privately-employed physician.

{¶ 22} Here, unlike the facts in *Engel*, UH/UCCOM and the Holzer Clinic contracted to educate residents on various aspects of general surgery. UH/UCCOM assigned the residents to the Holzer Clinic and supplied both goals and objectives such residents were to achieve while on rotation at the Holzer Clinic. UH/UCCOM required the Holzer Clinic to teach and train the residents while such residents actively participated in direct patient care and various medical procedures performed at the Holzer Clinic. Such a relationship allowed the Holzer Clinic to increase the total volume of patients assisted, increasing Holzer Clinic's fee income. Additionally, Holzer Clinic was obligated to pay for the use of the residents. Cunningham explained that the daily rate is established solely by UC and that Holzer Clinic does not otherwise compensate the residents for their services while on rotation. The facts demonstrate that Dr. Campion was involved in much more than simple observation and that Dr. Canady was

---

[6] Black's Law Dictionary defines the symbiotic-relationship test as "the standard by which a private person may be considered a state actor—and may be liable for violating someone's constitutional rights—if the relationship between the private person and the government is so close that they can fairly

required to provide personal instruction to Dr. Campion. Accordingly, the court finds a symbiotic relationship exists between UC and the Holzer Clinic. Based upon the foregoing, the court makes a determination that Dr. Canady was an employee of UC as that term is used in *Engel, supra*.

{¶ 23} Furthermore, there is no question that Dr. Canady was acting within the scope of his employment with the state at the time of the alleged negligence. Indeed, Dr. Campion assisted Dr. Canady in his treatment of plaintiff's decedent by obtaining a formal medical history, admitting him to Holzer Medical Center, and aiding the performance of the laparoscopic procedure. Moreover, Dr. Canady instructed Dr. Campion on the proper mechanics of the procedure throughout the placement of the gastric band.

{¶ 24} For the foregoing reasons, the court finds that Dr. Canady is entitled to immunity pursuant to R.C. 9.86 and 2743.02(F) and that the courts of common pleas do not have jurisdiction over any civil actions that may be filed against him based upon the allegations in this case.

_____
CLARK B. WEAVER SR.
Judge

cc:

Brian M. Kneafsey, Jr.                         Lawrence A. Riehl
Assistant Attorney General                 500 South Front Street, Suite 200
150 East Gay Street, 18th Floor          Columbus, Ohio 43215-5644
Columbus, Ohio 43215-3130

Thomas D. Hunter
536 South High Street
Columbus, Ohio 43215

003

---

be said to be acting jointly. * * * State action may be showing by proving that the private person and the state have a mutually dependent (symbiotic) relationship." *Black's Law Dictionary* 1587 (9th Ed.2009).

Filed September 27, 2012
To S.C. Reporter January 28, 2013