RIES, ADMR., ET AL., APPELLANTS, *v.* OHIO STATE UNIVERSITY MEDICAL

CENTER, APPELLEE.

**[Cite as *Ries v. Ohio State Univ. Med. Ctr.,* 137 Ohio St.3d 151,**

**2013-Ohio-4545.]**

*Governmental tort immunity—R.C. 9.86—Personal immunity of state employee—*

*Doctor employed by state university to provide clinical care to patients.*

(No. 2012-0954—Submitted April 10, 2013—Decided October 17, 2013.)

APPEAL from the Court of Appeals for Franklin County,

No. 11AP-1004, 2012-Ohio-1766.

————————————

**O'DONNELL, J.**

**{¶ 1}** Matthew Ries, administrator of the estate of Michael McNew, and Cyrelle McNew, McNew's surviving spouse, appeal from a judgment of the Tenth District Court of Appeals affirming the determination that Syed G. Husain, M.D., is immune from personal liability for treatment provided to Michael McNew at the Ohio State University Medical Center. At issue in this case is whether a faculty member of a state medical school who is also employed by the school's nonprofit medical-practice corporation is immune from personal liability for providing clinical care to a patient with neither a medical student nor a resident present during the treatment or procedure.

**{¶ 2}** R.C. 9.86 provides immunity to state employees unless the employee acts manifestly outside the scope of employment, with malicious purpose, in bad faith, or in a wanton or reckless manner. For purposes of this statute, a state employee acts within the scope of employment if the employee's actions advance the interests of the state as defined by the duties of the state employee.

{¶ 3} Here, Husain's duties as a state employee included providing clinical care to patients, whether or not he was actively engaged in teaching at that time. Thus, in treating McNew, Husain served the interests of the Ohio State University Medical Center and acted within the scope of employment. He is therefore entitled to personal immunity pursuant to R.C. 9.86, and we affirm the judgment of the court of appeals.

**Facts and Procedural History**

{¶ 4} In September 2008, Dr. Syed G. Husain joined the faculty of the Ohio State University College of Medicine in the Department of Surgery. As an assistant professor on the clinical track, he had the primary responsibilities of providing clinical care to patients and teaching medical students and residents. His letter offering employment stated that the Department of Surgery expected him to be an active teaching member of the full-time faculty, to engage in research, and to provide service to the institution, the community, and the profession as "measured by evidence of a high level of clinical competence." Although his contract with the university guaranteed a base salary, it contemplated that he would "generate sufficient funds through clinical revenue, extramural funding, teaching activities, or administrative assignments to fund [his] salary and benefits." It also required him to devote 100 percent of his professional efforts to the Department of Surgery, with patient-care revenue reverting to OSU Surgery, L.L.C.

{¶ 5} The offer letter further specified that "[p]articipation in the College Central Practice Group is a requirement of employment." The Ohio State University Board of Trustees established the College Central Practice Group to manage income generated by faculty members from providing patient care and organized it as Ohio State University Physicians, Inc. ("OSUP"), a nonprofit corporation. OSUP is "a tax-exempt medical practice plan corporation which was created to advance the purposes of the medical education program and related

2

research and clinical service activities of the Ohio State University College of Medicine and Public Health ('COMPH')." The board of trustees further required participation in this practice plan as "a condition of faculty employment."

{¶ 6} Husain separately contracted with OSUP to "permit OSUP or its designee to bill and collect professional fees for all faculty services including, but not limited to clinical services in the conduct of the COMPH mission." That employment agreement also provided that his "practice activities shall be rendered to patients in connection with the clinical practice activities of the medical education program of COMPH." Pursuant to this contract, the university's senior vice president for health services approved all compensation, and "[s]ervices performed and compensation received by [Husain] under this Agreement are specifically recognized as being in fulfillment of obligations which are part of the concurrent faculty appointment and employment by COMPH."

{¶ 7} The Department of Surgery assigned Husain to staff the colorectal surgery clinic at University Hospital East. Medical students and residents rotate through the clinic as part of their education and training, and members of the clinical faculty such as Husain generally teach by allowing students and residents to observe and participate in the treatment of patients; however, instruction also occurs outside the presence of the patient when faculty members review charts and discuss cases with students and residents.

{¶ 8} On September 15, 2009, Michael McNew consulted with Husain at the clinic, complaining of an acutely painful hemorrhoid in addition to nausea, diarrhea, sore throat, and fatigue. Husain diagnosed a blood clot in the hemorrhoid, incised it, removed the clot, and prescribed a narcotic for pain. Although a medical student or resident was present at the clinic that day, Husain could not remember whether one had observed this treatment, nor do McNew's records indicate the presence of a student or resident.

**{¶ 9}** Following McNew's discharge, he called Husain more than once seeking help with pain management and allegedly complained of bleeding, bruising, and shortness of breath. Husain could not recall whether a medical student or resident observed the telephone consultations.

**{¶ 10}** McNew died on September 19, 2009, from an undiagnosed cerebral hemorrhage caused by thrombocytopenia, a hematological malignancy characterized by an abnormally small number of platelets in the circulating blood. *Stedman's Medical Dictionary* 1808 (26th Ed.1995).

**{¶ 11}** On September 3, 2010, Matthew Ries, the administrator of McNew's estate, and Cyrelle McNew, his surviving spouse, brought this action in the Court of Claims against the Ohio State University Medical Center, asserting claims for negligence, medical malpractice, wrongful death, and loss of consortium. They also filed a civil action against Husain and OSUP in the Franklin County Common Pleas Court, which the common pleas court stayed pending a determination by the Court of Claims regarding Husain's immunity from suit.

**{¶ 12}** The Court of Claims conducted a hearing on that issue, and the Ohio State University Medical Center presented the testimony of Dr. Robert Alan Bornstein, the vice dean for academic affairs in the College of Medicine. Bornstein testified that the focus of faculty members on the clinical track is patient care and education. He noted that patient care is essential to the educational mission of the medical school because "in order for us to exercise our obligation to teach students, we have to have a range of patients, and we have to have physicians who are there to take care of those patients." He also explained that patient care furthers the university's interests because its reputation in providing clinical care is a component in ranking medical centers nationally, and "the reputation of our faculty, whether it's for research, for teaching or clinical

4

service, is central to our interests."  Moreover, the revenue generated by the faculty is contributed to the university to support its academic programs.

{¶ 13} Bornstein clarified that the term "service" as used in the letter of offer means providing care to patients: "[C]linical service is * * * one of the components of faculty activity.  Some clinical activity is done with a student or resident; some is not.  It is still their responsibility as a faculty member to take care of patients."  He also testified, "Faculty in the College of Medicine controls 100 percent of the faculty member's efforts: Teaching, service and scholarship.  Everything that they do they are doing as a member of our faculty."  In his view, the clinical care of patients is therefore within the scope of the duties of a faculty member, regardless of whether a student or resident is present at the time of the treatment.

{¶ 14} The Court of Claims acknowledged that Husain's duties as a member of the university faculty included teaching but found that "the evidence does not demonstrate that he was doing so when the alleged negligence occurred."  Nonetheless, it determined that Husain's duties as a faculty member included providing clinical care to patients for the Ohio State University Medical Center and that he had been acting within the scope of his state employment while treating McNew.  The Court of Claims therefore concluded that Dr. Husain was immune and that the common pleas court lacked jurisdiction over the civil action filed against him.

{¶ 15} Ries appealed to the Tenth District Court of Appeals, which affirmed the determination that Husain was immune from suit, holding that his employment with the state required him to care for patients at facilities operated by the Ohio State University Medical Center.  The appellate court explained:

> [P]hysicians with the employment contracts such as those provided
> to Dr. Husain wear two hats while treating patients. One hat says

"[the Ohio State University Medical Center]" and the other says "OSUP." Dr. Husain was wearing both while treating McNew. Since one of the hats involved employment duties with a governmental entity, he was entitled to governmental immunity under R.C. 9.86 and R.C. 2743.02(F).

2012-Ohio-1766, ¶ 13.

## Arguments on Appeal

{¶ 16} On appeal to this court, Ries contends that "[a] physician whose state employment duties are education-related must be shown to be engaging in education-related activity at the time he allegedly renders negligent care in order to qualify for civil immunity pursuant to R.C. 9.86 and R.C. 2743.02(F)." According to Ries, Husain's duties as a state employee were limited to conducting research and teaching medical students and residents, and here there is no evidence that he either engaged in research or taught at the time he treated McNew. Further, he notes that Husain had two separate contracts: one as a faculty member of the College of Medicine that paid him a salary for research, teaching, and allowing medical students and residents to observe his clinical practice, and another contract governing his personal medical practice (i.e., when no student or resident is present) with OSUP, a private corporation operating independently from the Ohio State University Medical Center. Ries asserts that providing clinical care to patients, by itself, "is not a recognized function of a state university teaching hospital," and because Husain treated McNew in the course of his personal medical practice, he is not immune in the circumstances.

{¶ 17} The Ohio State University Medical Center urges that Dr. Husain acted within the scope of his state employment and is therefore immune from liability for claims arising from his treatment of McNew. Relying on *Theobald v. Univ. of Cincinnati,* 111 Ohio St.3d 541, 2006-Ohio-6208, 857 N.E.2d 573, it

contends that the scope of state employment turns on the physician's duties as a state employee. Here, it explains, Dr. Husain's contract as a member of the university faculty required him to provide clinical care to patients like McNew, whether or not a student or resident observed that treatment, the university controlled his clinical practice and his teaching, and OSUP functioned only as a billing and collections entity.

{¶ 18} Accordingly, the issue here is whether a faculty member of a state medical school who is also employed by the school's nonprofit medical-practice corporation acts within the scope of employment when treating a patient outside the presence of a medical student or resident.

**Immunity of State Employees**

{¶ 19} The personal immunity of a state employee is governed by R.C. 9.86, which provides:

> Except for civil actions that arise out of the operation of a motor vehicle and civil actions in which the state is the plaintiff, no officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner.

{¶ 20} R.C. 2743.02(F) vests the Court of Claims with exclusive jurisdiction to determine whether a state employee is immune from personal liability in a civil action allowed by R.C. 9.86. As we explained in *Theobald v. Univ. of Cincinnati*, 111 Ohio St.3d 541, 2006-Ohio-6208, 857 N.E.2d 573, ¶ 14,

"the Court of Claims' analysis of personal immunity has two parts: Was the individual a state employee, and if so, was the individual acting within the scope of employment when the cause of action arose?" We further stated:

> A health-care practitioner who has dual status as a private practitioner and as an employee of a state medical institution is potentially immune from liability for medical malpractice only when he or she is performing duties *for the state*. Unless he or she acted "with malicious purpose, in bad faith, or in a wanton or reckless manner" or manifestly outside the scope of employment, the state employee is not liable for injury caused in the performance of those duties.

(Emphasis added.) *Theobald* at ¶ 16.

**{¶ 21}** We noted that the Revised Code does not define "scope of employment," but we observed that "[t]he concept generally denotes an agency relationship in which the agent or employee is engaged in an activity that is logically related to the business of the principal or employer." *Theobald* at ¶ 15. We held, "For purposes of personal immunity under R.C. 9.86, a state employee acts within the scope of employment if the employee's actions are 'in furtherance of the interests of the state.' *Conley v. Shearer* (1992), 64 Ohio St.3d 284, 287, 595 N.E.2d 862. Thus, a state employee's duties should define the scope of employment." *Id.*

**{¶ 22}** Notably, in *Theobald* we rejected the argument that the use of private practice plans to bill and collect payments for the services that clinical faculty members provide as part of their practice of medicine shows that a physician has acted outside the scope of state employment. Rather, we explained:

8

The financial factors may be relevant to the practitioner's status as a state employee; however, they do not necessarily establish whether he or she was within the scope of that employment at the time a cause of action arose. Instead, the question of scope of employment must turn on what the practitioner's duties are as a state employee and whether the practitioner was engaged in those duties at the time of an injury. Thus, proof of the content of the practitioner's duties is crucial. The Court of Claims must have evidence of those duties before it can be determined whether the actions allegedly causing a patient's injury were "in furtherance of the interests of the state" or, in other words, within the scope of employment.

*Theobald,* 111 Ohio St.3d 541, 2006-Ohio-6208, 857 N.E.2d 573, at ¶ 23.

**{¶ 23}** Thus, *Theobald* did not establish a categorical rule that a physician who is a member of the faculty of a state medical college is immune for providing clinical care only while teaching a medical student or resident.  Rather, the scope of employment is a fact-based inquiry that turns on proof of the employee's specific job description with the state and focuses on whether the employee's conduct is related to and promotes the state's interests.

**{¶ 24}** In addition, the fact that a state employee is also employed by a private party is not determinative.  As the court in *Theobald* stated, "R.C. 9.86 is inclusive and makes no exception for persons who may simultaneously have other employment interests. It provides immunity for all state employees as long as they are acting within the scope of their employment when the injury occurs." *Theobald* at ¶ 25.

**{¶ 25}** And following *Theobald*, in *State ex rel. Sawicki v. Lucas Cty. Court of Common Pleas*, 126 Ohio St.3d 198, 2010-Ohio-3299, 931 N.E.2d 1082,

we recognized that it is possible for a physician to be immune as an agent of the state when the physician simultaneously acted on behalf of a private practice group. *Id.* at ¶ 20. The court explained in *Sawicki*, " '[A] single act may be done to effect the purposes of two independent employers. * * * He may be the servant of two masters, not joint employers as to the same act, if the act is within the scope of his employment for both.' " *Id.* at ¶ 17, quoting Restatement of the Law 2d, Agency, Section 226, at Comment a (1958).

{¶ 26} In this case, it is not disputed that Husain is a state employee, and the evidence demonstrates that he acted on behalf of the state at the time he treated McNew. The Department of Surgery, not OSUP, directed and controlled his clinical care of patients and assigned him to staff the university's colorectal surgery clinic, where McNew presented. Husain's contract with the university required him to treat patients at that facility, to participate in OSUP, and to fund his own faculty salary and benefits through outside sources, including clinical revenue from his treatment of patients.

{¶ 27} In addition, Husain's employment agreement with OSUP provided that the corporation would bill and collect professional fees for "all faculty services" and specified that any compensation received pursuant to that agreement fulfilled the duties of his faculty appointment and his employment with the College of Medicine. Although the record does not detail the precise ownership structure of OSUP, it does establish that the board of trustees authorized its creation, that "it exists within the University structure," and that revenue it generates is contributed back to the university to support academic programs.

{¶ 28} Even if no medical student or resident observed the clinical services Husain rendered, and even though the university organized its medical-practice plan as a private corporation, Husain's clinical practice advanced the interests of the state because he staffed a faculty clinic and treated patients at the Ohio State University Medical Center, he contributed to its national ranking and

reputation, and he generated revenue that supported the academic mission of the university.

{¶ 29} Husain therefore provided clinical services at the Ohio State University Medical Center and its facilities within the scope of his employment as a faculty member of the university and a state employee. Accordingly, because he treated McNew in that capacity, he is entitled to personal immunity.

### Conclusion

{¶ 30} Pursuant to R.C. 9.86, a state employee is immune from personal liability unless the employee's actions were manifestly outside the scope of his employment or unless the employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner. A state employee acts within the scope of employment if the employee's actions advance the interests of the state as defined by the duties of the state employee.

{¶ 31} Here, Husain's duties as a state employee included providing clinical services to patients, and at the time he treated McNew, he acted within the scope of his state employment. Accordingly, he is entitled to personal immunity pursuant to R.C. 9.86. We therefore affirm the judgment of the court of appeals.

Judgment affirmed.

O'CONNOR, C.J., and KENNEDY and HENDON, JJ., concur.

LANZINGER, J., concurs in judgment only.

PFEIFER and O'NEILL, JJ., dissent.

SYLVIA SIEVE HENDON, J., of the First Appellate District, sitting for FRENCH, J.

_____

**O'NEILL, J., dissenting.**

{¶ 32} This case represents a very dangerous precedent, and I must, therefore, respectfully dissent. The majority has needlessly expanded on this court's holding in *Theobald v. Univ. of Cincinnati*, 111 Ohio St.3d 541, 2006-

Ohio-6208, 857 N.E.2d 573, and in the sweep of a pen has extended governmental tort immunity to private corporations that utilize state facilities for profit. In *Theobald*, this court held that a doctor working for a university is immune from personal liability if he is, in fact, educating a student or resident when the negligence occurs. *Id.* at ¶ 31. That is an educational relationship that makes sense, and one that has withstood the test of time. The taxpayers of Ohio are well served, and the doctors who educate our future physicians are well served, when there is an acknowledgement that they are doing the state's business when they are teaching student doctors in a state-university setting.

{¶ 33} But the majority abandons that rule and adopts a standard that allows the university to decide and declare by contract that all of a physician's duties, no matter how far they may be removed from educating students, are entitled to state-sanctioned immunity. That is the wrong approach, and it is simply illogical and contrary to statute to provide immunity for acts that are completely unrelated to the education of students. The net result is that the burden of paying for negligent acts will transfer from private insurance companies to the taxpayers of Ohio. It will also diminish the role of juries in the Ohio justice system, as jury trials are not available in the Ohio Court of Claims for claims against the state. R.C. 2743.11. Can we really say that is what the legislature intended? There is no good reason to extend immunity to physicians who are not actively training students in the practice of medicine.

{¶ 34} Prior to *Theobald*, Ohio courts were consistent in their holdings that a student had to be present in order for there to be immunity for the doctor. For example, in *Hopper v. Univ. of Cincinnati*, 10th Dist. Franklin No. 99AP-787, 2000 WL 1059672 (Aug. 3, 2000), the court held that since the physician was supervising residents while treating the patient, the conduct was within the scope of his employment as a state employee. *See also Balson v. Ohio State Univ*., 112 Ohio App.3d 33, 677 N.E.2d 1216 (10th Dist.1996) (doctors not entitled to

immunity, because a separate practice plan was the employer and no students were present for the procedure); *Katko v. Balcerzak*, 41 Ohio App.3d 375, 536 N.E.2d 10 (10th Dist.1987) (doctor billing through his private medical partnership with no student present resulted in a finding of no immunity); *Johnson v. Univ. of Cincinnati,* 10th Dist. Franklin No. 04AP-926, 2005-Ohio-2203 (even though physicians were employed by the medical school as faculty and conducted a clinical practice supervising residents, no students were present for the procedure, so there was no immunity); *Harrison v. Univ. of Cincinnati Hosp.*, 10th Dist. Franklin No. 96API01-81, 1996 WL 362055  (June 28, 1996) (doctor was a member of a practice plan as a faculty member but since no student was present for the procedure, he was outside the scope of his state employment); *Hans v. Ohio State Univ. Med. Ctr.*, Ct. of Cl. No. 2001-10140, 2005-Ohio-4457 (Court of Claims determined that because the physician performed the procedure while being observed by a student, he was acting within the scope of his employment and therefore entitled to immunity); *Kaiser v. Ohio State Univ*., 10th Dist. Franklin No. 02AP-316, 2002-Ohio-6030 (attending physician acted as a supervisor and, as such, was entitled to immunity, since he was acting within the scope of his employment).

{¶ 35} In *Theobald*, this court noted many of these cases and acknowledged that the focus of the analysis needed to be on the scope of employment with the state and on whether the physician was engaged in those duties at the time of the injury. *Theobald,* 111 Ohio St.3d 541, 2006-Ohio-6208, 857 N.E.2d 573, at ¶ 23-27.  The bedrock principle that this court should uphold is that in the absence of a student, a procedure performed by a physician should not be protected by the doctrine of immunity.  State universities exist to educate.  If education is not taking place, immunity does not apply.  Clearly, while educating is a legitimate function of the state, competing with private hospitals is not.  Providing universities and the doctors who operate in university hospitals

with an economic edge is contrary to precedent and not a function of the judiciary.

{¶ 36} Based upon the opinion by the majority, state university teaching hospitals can now provide independent medical care separate and apart from their status as a teaching institution, and while doing so, their physicians will enjoy the benefits of immunity. All they should need from this point forward is the state university logo on the door and a contract calling everyone inside a faculty member. The student doctors, while still welcome to attend, are no longer necessary for immunity to attach.

{¶ 37} If the theory of the majority is truly the law of Ohio, the hospitals run by state universities and staffed by physicians who work for private for-profit corporations have a huge competitive advantage over private hospitals. They are able to limit their damage exposure due to lower caps in the Court of Claims, while also eliminating jury trials, yet operate in all other ways like the private hospitals that they compete with. Why is it necessary to give state hospitals this kind of economic advantage? Unless those physicians are actively involved in training new physicians or researching new procedures, there is no justification for providing them with such special treatment. While furthering a state hospital's societal contribution by providing medical care combined with education is a worthy accomplishment, merely advancing the state hospital's competitive economic advantage is not. Moreover, it is outside of the powers of the judiciary to make that kind of policy change.

{¶ 38} Additionally, under the majority's holding, once immunity attaches, mere negligence is no longer the standard that physicians will be held to in performing their important procedures. These "state employee" doctors can now theoretically operate at a lower standard of care without fear of reprisal, provided that they do not go over the line in a wanton or reckless manner, or with malicious purpose. This decision sets a dangerous precedent. Stated more

precisely, a state-university doctor will no longer be held to the same standard of care that is applied to his colleagues down the street in a competing facility not owned by the state. Simple negligence that arguably causes death, as is alleged herein, does not rise to the level of wanton misconduct. I understand and embrace immunity for the purpose of training our doctors of the future. That is a legitimate state activity. Creating an insurance-friendly environment in which for-profit corporations can find a safe haven is not.

{¶ 39} Accordingly, I respectfully dissent.

PFEIFER, J., concurs in the foregoing opinion.

_____

Colley, Shroyer & Abraham Co., L.P.A., and David I. Shroyer, for appellants.

Michael DeWine, Attorney General, Peter K. Glenn-Applegate, Deputy Solicitor, and Karl W. Schedler and Daniel R. Forsythe, Assistant Attorneys General, for appellee.

Giorgianni Law, L.L.C., and Paul Giorgianni, urging reversal for amicus curiae, Ohio Association for Justice.

_____