[Cite as *Landers v. Ohio Dept. of Rehab. & Corr.*, 2022-Ohio-2386.]

| CHARLES A. LANDERS, JR | Case No. 2020-00718JD |
|---|---|
| Plaintiff | Magistrate Gary Peterson |
| v. | <u>DECISION OF THE MAGISTRATE</u> |
| OHIO DEPARTMENT OF REHABILITATION AND CORRECTION | |
| Defendant | |

{¶1} Plaintiff, formerly an inmate in the custody and control of defendant, brings this action alleging that on December 29, 2018, employees of defendant at Franklin Medical Center (FMC) injured him in an incident that amounted to excessive use of force.

{¶2} Upon defendant's motion, this matter came on for an evidentiary hearing to determine whether former corrections officer Korday R. Allison, former corrections officer Jovan Cason, and former corrections officer Paris C. Love are entitled to civil immunity pursuant to R.C. 9.86 and 2743.02(F), so that it may be determined whether jurisdiction over the merits of the case rests with the Court of Claims or the courts of common pleas.

<u>Findings of Fact</u>

{¶3} On December 29, 2018, plaintiff was an inmate in the custody and control of defendant at FMC. On that day, Allison confiscated plaintiff's cigarette. Although cigarettes are not allowed at FMC, Allison let the inmates smoke. Plaintiff previously provided Allison with a honey bun and a pop to be allowed to smoke, but on that day, plaintiff did not give Allison a honey bun and a pop. Allison confiscated plaintiff's cigarette and gave it to another inmate, causing plaintiff to be upset. Plaintiff believed it to be unfair that Allison allowed other inmates to smoke but did not allow him to smoke. This encounter occurred on the upstairs range of the housing unit.

{¶4} The following is recorded on defendant's video surveillance system. Defendant's Exhibit A; plaintiff's Exhibit 1. Approximately five minutes after Allison

confiscated plaintiff's cigarette, plaintiff slowly walks behind the officer's station on the first floor of the housing unit, also known as the dayroom. Plaintiff is holding a radio, which he described to be similar to an mp3 player with controls like a cell phone. Both plaintiff's hands are gripping the radio as seen on the video. Allison, who is wearing a black hat, enters the frame and walks around the opposite side of the officer's station. Allison's hands are in his pockets, and he walks directly to plaintiff. Allison and plaintiff appear to be engaging in a conversation. Plaintiff reports that Allison called him a "pussy bitch." Plaintiff points his finger and appears to be upset. Plaintiff remarked at trial that he told Allison that he thought it was "messed up" that Allison confiscated his cigarette but allowed other inmates to smoke. At this point, three other corrections officers, including Cason and Love exit the officer's station and approach Allison and plaintiff. Allison turns around and appears to acknowledge their presence. The third unidentified corrections officer continues walking around the officer's station out of the view of the surveillance camera. Allison is inches from plaintiff's face, and plaintiff appears to be backed up against a wall. Approximately a dozen other inmates are present in the dayroom, and all the inmates seem to turn their attention to the confrontation involving plaintiff.

{¶5} The group moves slightly to the left of view on the camera. The officer's station largely obscures the view of what occurs next; nevertheless, the evidence established that Allison initially struck plaintiff and that Cason and Love joined the fracas immediately thereafter. Through the windows of the officer's station, plaintiff is seen falling toward the telephones on the back wall. Plaintiff appears to attempt to stabilize himself only to fall again with a corrections officer on top of him. The corrections officers appear to struggle with plaintiff while he is on the ground.

{¶6} Plaintiff subsequently attempts to escape toward the exercise equipment as the group emerges from behind the officer's station and back into view of the camera. Allison follows, eventually tackling plaintiff to the ground. Cason and Love quickly follow

behind. Cason appears to strike plaintiff in the head/neck. Allison, who is no longer wearing a hat, picks up a blue chair and hits plaintiff with the chair while plaintiff is on the ground. As plaintiff attempts to get back up off the ground, Love pushes plaintiff in the back down to the ground. Allison then swings his fist at plaintiff's head. Allison and Love jointly push plaintiff back to the ground as plaintiff again attempts to get up. Allison and Cason both appear to strike plaintiff while plaintiff is on the ground. Cason then grabs plaintiff from behind and Allison again strikes plaintiff. Cason picks plaintiff up off the ground, and along with Love, throws plaintiff to the ground. Allison then appears to kick plaintiff in the face. As plaintiff is again attempting to stand up, Allison pushes plaintiff's face down on the edge of the pool table. Plaintiff then stands up, and Allison walks away. Plaintiff then leaves the dayroom. The physical altercation lasts approximately one minute as shown on the video time stamp.

{¶7} At no point do any of the corrections officers attempt to place handcuffs on plaintiff, and at no point during the altercation do any of the corrections officers activate their man down alarms. Allison activated the man down alarm well after the altercation concluded. After plaintiff left the dayroom, he sat on a bench where he was subsequently handcuffed and escorted to the captain's office rather than to medical. Plaintiff later completed an "inmate confidential statement" wherein he documented the events. Defendant's Exhibit K.

{¶8} Allison had been a corrections officer for nearly four years as of December 29, 2018. Prior to beginning his employment, Allison completed a two-week officer's training, which included training on the use of force. Allison also completed annual officer's training. Prior to this incident, Allison had never completed an incident report regarding the use of force.

{¶9} On December 29, 2018, Allison was assigned to Dorm 2 of FMC as a regular corrections officer. Allison previously had no issues or problems with plaintiff prior to that day. Allison caught plaintiff with a cigarette, and as one of his job duties, he confiscated

plaintiff's cigarette. According to Allison, plaintiff was saying "crazy stuff" after he confiscated the cigarette.

{¶10} Allison maintained that he approached plaintiff in the dayroom to deescalate the situation. Allison reported that plaintiff used explicit language causing him to fear for his own personal safety. Allison acknowledged, however, that he did not activate his man down alarm at this time. Allison stated that plaintiff refused to obey prison orders, rules, and regulations, and that plaintiff would not "cuff up." Allison maintained that plaintiff made a sudden move that caused him to believe he was at risk of harm, that plaintiff's hands were in his pockets, and at that point Allison began to protect himself. Allison denied coordinating the use of force on plaintiff with Cason and Love and maintained that it was their job to back him up in the confrontation. After the use of force, Allison did not attempt to place handcuffs on plaintiff. Allison explained that after the use of force, he felt like he was going to "pass out."

{¶11} Allison authored an incident report following the use of force and participated in an administrative investigation regarding the incident. Defendant's Exhibits B and G. Cason and Love also completed incident reports following the use of force and participated in an administrative investigation regarding this event. Defendant's Exhibits C, D, I, and J. Allison's, Cason's, and Love's employment was subsequently terminated, and they thereafter plead guilty to criminal dereliction of duty. Defendant's Exhibits O, P, Q, and U.

{¶12} Greg Harris is employed with defendant at FMC as an investigator. Harris acts as a liaison between defendant and the Ohio State Highway Patrol investigating anything that could lead to criminal charges, including the use of force by staff. Harris gathered incident reports, medial examination reports, inmate statements; conducted interviews; and reviewed video of the use of force. Corrections officers are trained to deescalate a situation; to remove oneself from a situation if necessary; to allow another corrections officer to talk if warranted; not to raise their voices; and to call for assistance.

Regarding the use of force policy, corrections officers should use the least amount of force necessary to control a situation beginning with an order to cuff up. If refused, then chemical mace may be used. If that does not gain compliance, then the least amount of physical force to control the situation may be used. The use of force does not include stomping, chair throwing, or punching in the face. Harris explained that Cason was a probationary officer undergoing on-the-job training by Love. Harris stated that it is Love's responsibility to ensure Cason has the necessary equipment including handcuffs, which Cason did not have that day. Leah Bobb-itt and James Hogon both authenticated several of the exhibits that were used at the hearing.

Conclusions of Law and Discussion

{¶13} "In accordance with R.C. 2743.02(F), the Court of Claims 'has exclusive jurisdiction to determine whether a state employee is immune from liability under R.C. 9.86.'" *Nix v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 13AP-547, 2014-Ohio-2902, ¶ 22, quoting *Johns v. Univ. of Cincinnati Med. Assocs.*, 101 Ohio St.3d 234, 2004-Ohio-824, syllabus. There is no dispute that Allison, Cason, and Love were at all times relevant state employees.

{¶14} R.C. 9.86 states, in part:

{¶15} "Except for civil actions that arise out of the operation of a motor vehicle and civil actions in which the state is the plaintiff, no officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner."

{¶16} "[T]he question of scope of employment must turn on what the [employee's] duties are as a state employee and whether the [employee] was engaged in those duties at the time of an injury." *Theobald v. Univ. of Cincinnati*, 111 Ohio St.3d 541, 2006-Ohio-6208, ¶ 23. "[T]he scope of employment is a fact-based inquiry that turns on proof of the

employee's specific job description with the state and focuses on whether the employee's conduct is related to and promotes the state's interests." *Ries v. Ohio State Univ. Med. Ctr.*, 137 Ohio St.3d 151, 2013-Ohio-4545, ¶ 23.

{¶17} "An employee's wrongful act, even if it is unnecessary, unjustified, excessive or improper, does not automatically take the act manifestly outside the scope of employment. * * * The act must be so divergent that it severs the employer-employee relationship." *Elliott v. Ohio Dept. of Rehab. & Corr.*, 92 Ohio App.3d 772, 775 (10th Dist.1994). "The fact that the conduct constituting the tort was committed while the employee was on duty and supposedly performing services for his employer, does not render the employer liable where the employee deviated or departed from his employer's business to engage upon a matter for his own personal purposes without benefit to the employer." *Caruso v. State*, 136 Ohio App.3d 616, 621 (10th Dist.2000). The Supreme Court of Ohio has held that "'an intentional and wilful attack committed by an agent or employee, to vent his own spleen or malevolence against the injured person, is a clear departure from his employment and his principal or employer is not responsible therefor.' * * * In other words, an employer is not liable for independent self-serving acts of his employees which in no way facilitate or promote his business." *Byrd v. Faber*, 57 Ohio St.3d 56, 59 (1991), quoting *Vrabel v. Acri*, 156 Ohio St. 467, 474 (1952).

{¶18} For purposes of R.C. 9.86, "[m]alicious purpose encompasses exercising 'malice,' which can be defined as the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct that is unlawful or unjustified." *Caruso* at 620.

{¶19} "Bad faith has been defined as the opposite of good faith, generally implying or involving actual or constructive fraud or a design to mislead or deceive another. * * * Bad faith is not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Id.* at 621.

{¶20} "[R]eckless conduct refers to an act done with knowledge or reason to know of facts that would lead a reasonable person to believe that the conduct creates an unnecessary risk of physical harm and that such risk is greater than that necessary to make the conduct negligent. * * * The term 'reckless' is often used interchangeably with the word 'wanton' and has also been held to be a perverse disregard of a known risk." *Id.* In a similar statutory context arising under R.C. Chapter 2744, though, the Supreme Court held that the terms 'wanton' and 'reckless' are not interchangeable and defined wanton misconduct as "'the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result.'" *Wrinn v. Ohio State Hwy. Patrol*, 10th Dist. Franklin No. 11AP-1006, 2013-Ohio-1141, ¶ 13, quoting *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, paragraph three of the syllabus.

{¶21} "If the Court of Claims determines that the employee's acts did not further the interests of the state, i.e., the employee was acting outside the scope of his employment, maliciously, in bad faith, or in a wanton or reckless manner, the state has not agreed to accept responsibility for the employee's acts and the employee is personally answerable for his acts in a court of common pleas." *Conley v. Shearer*, 64 Ohio St.3d 284, 287 (1992).

{¶22} "The determination as to whether or not a person is entitled to immunity under R.C. 2743.02(F) and 9.86 is a question of law." *Morway v. Ohio Bur. of Workers' Comp.*, 10th Dist. Franklin No. 04AP-1323, 2005-Ohio-5701, ¶ 17. "To make that determination, however, the court must consider specific facts." *Peachock v. Northcoast Behavioral Health Ctr.*, 10th Dist. Franklin No. 07AP-195, 2007-Ohio-5160, ¶ 21. At the outset of the evidentiary hearing, it was agreed that defendant, as the party seeking to prove that personal liability should be imposed upon state employees, has the burden of proof.

{¶23} "The use of force is sometimes necessary to control inmates." *Jodrey v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 12AP-477, 2013-Ohio-289, ¶ 17. "Correctional officers considering the use of force must evaluate the need to use force based on the circumstances as known and perceived at the time it is considered." *Brown v. Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 13AP-804, 2014-Ohio-1810, ¶ 15, citing Ohio Adm.Code 5120-9-01(C). "[T]he precise degree of force required to respond to a given situation requires an exercise of discretion by the corrections officer." *Ensman v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 06AP-592, 2006-Ohio-6788, ¶ 23. "In Ohio Adm.Code 5120-9-01, the Ohio Administrative Code sets forth the circumstances under which correctional officers are authorized to use force against an inmate." *Id.* at ¶ 6.

{¶24} Ohio Adm.Code 5120-9-01 provides, in pertinent part:

"(C) Guidelines regarding the use of force. * * *

"* * *

"(2) Less-than-deadly force. There are six general circumstances in which a staff member may use force against an inmate or third person. A staff member may use less-than-deadly force against an inmate in the following circumstances:

"(a) Self-defense from physical attack or threat of physical harm.

"(b) Defense of another from physical attack or threat of physical attack.

"(c) When necessary to control or subdue an inmate who refuses to obey prison rules, regulations or orders.

"(d) When necessary to stop an inmate from destroying property or engaging in a riot or other disturbance.

"(e) Prevention of an escape or apprehension of an escapee; or

"(f) Controlling or subduing an inmate in order to stop or prevent self-inflicted harm."

{¶25} "Pursuant to Ohio Adm.Code 5120-9-01(C)(1)(a), correctional officers 'may use force only to the extent deemed necessary to control the situation.' Additionally, correctional officers 'should attempt to use only the amount of force reasonably necessary under the circumstances to control the situation and shall attempt to minimize physical injury.' Ohio Adm.Code 5120-9-01(C)(1)(b)." *Brown* at ¶ 16. Also pertinent is Ohio Adm.Code 5120-9-01(B)(3), which defines "excessive force" as "an application of force which, either by the type of force employed, or the extent to which such force is employed, exceeds that force which reasonably appears to be necessary under all the circumstances surrounding the incident."

{¶26} The magistrate finds that Allison is not entitled to civil immunity. Allison confiscated a cigarette from plaintiff while they were on the upper floor of the housing unit. Allison previously had allowed plaintiff to smoke as long as he received a pop and/or a honey bun, but on December 29, 2018, plaintiff did not give Allison a pop and/or a honey bun. Five minutes after he confiscated the cigarette, Allison approached plaintiff in the dayroom, down the stairs from where Allison had previously confiscated the cigarette. Plaintiff was looking at his radio at the time and his hands were not in his pockets as Allison contended at the hearing. Allison confronted plaintiff and engaged in a verbal altercation where Allison was face-to-face with plaintiff, who was backed up against the wall. The conversation appears to quickly intensify as shown by Allison's demeanor, plaintiff's reaction, and how the other dozen inmates in the dayroom focus their attention on Allison and plaintiff. It does not appear to have been a planned attack, as it occurred in the open, in front of a dozen inmates, and on camera. At no point during the physical altercation did plaintiff even attempt to harm Allison or the other officers; rather, plaintiff only attempted to evade the attack after he had been struck by Allison.

{¶27} Allison believed that plaintiff made a sudden move that caused him to fear for his own safety; however, the magistrate finds that such testimony is not credible. When Allison first struck plaintiff, plaintiff was surrounded by Allison, Cason, and Love.

Plaintiff, who had a radio in his hands at the time, did not pose a risk of physical harm. Additionally, the video belies Allison's claim that plaintiff had his hands in his pockets. Allison's demeanor, along with that of Cason and Love, was not consistent with any sort of a situation where they felt threatened by plaintiff. Indeed, prior to striking plaintiff, Allison turned his back to plaintiff and acknowledged Cason and Love. As Harris credibly explained, officers should attempt to deescalate the situation, order that an inmate cuff up, or disperse chemical mace prior to engaging in a physical altercation, and then, the officers should only use the least amount of force necessary to control the situation. Approved force does not include stomping, punching in the face, or throwing chairs. At no point does Allison attempt to handcuff plaintiff, deescalate the situation, or disperse chemical mace to gain control of plaintiff. Rather, Allison escalated the altercation by confronting plaintiff, cornering him, and striking him.

{¶28} As the attack continues, Allison tackled plaintiff to the floor, hit plaintiff with a chair, kicked plaintiff while he was on the ground, and slammed plaintiff's head into the edge of the pool table—all force that was excessive and unreasonable. At no point during the attack does Allison activate his man down alarm. After the attack concludes, Allison simply walked away and there was no attempt to handcuff plaintiff. Allison behaved with malicious purpose by acting with the willful and intentional design to seriously injure plaintiff in this unprovoked attack. Indeed, Allison failed to exercise any care toward plaintiff in circumstances where there was a probability that harm will result. In short, Allison acted with malicious purpose and his actions were manifestly outside the scope of employment.

{¶29} While there are circumstances in which employees of defendant are permitted to use force against an inmate when necessary to control a situation, in this case plaintiff posed no threat of physical harm to the staff or himself, he was not ordered to cuff up, he was not destroying property or engaged in a disturbance, and he was not escaping or threatening to escape. The situation was created by Allison's actions towards

plaintiff. Also, the facts of this case are distinguishable from others in which employees of defendant who were confronted with a situation involving some perceived misconduct by an inmate reacted on the spot to that situation and used more force than necessary, but nevertheless acted in furtherance of defendant's interests and not with malicious purpose, in bad faith, or in a wanton or reckless manner. *See generally Peppers v. Ohio Dept. of Rehab. & Corr.*, 50 Ohio App.3d 87 (10th Dist.1988); *Thomas v. Ohio Dept. of Rehab. & Corr.*, 48 Ohio App.3d 86 (10th Dist.1988); *Booth v. Ohio Dept. of Rehab. & Corr.*, Ct. of Cl. No. 2004-01419, 2005-Ohio-7018. Here, five minutes after Allison confiscated the cigarette, Allison confronted plaintiff in the dayroom, backed plaintiff up against the wall, and struck plaintiff without provocation with an apparent motive to punish plaintiff or to vent his anger—self-serving motives that removes Allison's actions from the scope of his employment. *See Jodrey* at ¶ 20 (finding that a corrections officer's only apparent motive in dumping an inmate out of his wheelchair and dropping the wheelchair on the inmate was to vent his anger; a self-serving motive that removed the officer's actions from the scope of employment).

{¶30} Moreover, the degree of force Allison used far exceeded that which could even arguably have been justified. Such excessive force included punches to the face, kicks to the head, a chair used as a weapon, and slamming plaintiff's face into the edge of the pool table. Indeed, the evidence put forth at the hearing shows that Allison attacked plaintiff with the intention or desire to do some harm through an unjustified, punitive use of force, and the excessiveness of that force was sufficiently malevolent and significant enough in degree as to sever the employer-employee relationship. *Nix v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 13AP-547, 2014-Ohio-2902, ¶ 22*; Adams v. Ohio Dept. of Rehab. & Corr.*, Ct. of Cl. No. 2013-00140, (July 26, 2016).

{¶31} Regarding the actions of Cason and Love, the magistrate finds that they did not act with malicious purpose, in bad faith, or in a wanton or reckless manner. Cason and Love did not confiscate the cigarette or initiate the confrontation between Allison and

plaintiff. It was only after Allison confronted plaintiff that Cason and Love emerged from the officer's station. Indeed, as shown on the video, Allison walked up to plaintiff and engaged him in a conversation that appeared to get heated right away. As Allison and plaintiff were face-to-face, Cason and Love exited the officer's station and stood by Allison.

{¶32} It was not established that Cason's and Love's actions were a part of a planned coordinated attack on plaintiff; rather, Cason and Love responded in the moment to the confrontation between Allison and plaintiff. It was not established that Cason and Love had prior knowledge of any planned confrontation involving Allison and plaintiff. Additionally, rather than attempting to carry out a planned attack in a less visible location to conceal their actions, the confrontation was caught on video surveillance and occurred in the dayroom surrounded by dozens of other inmates, some of whom where only a few feet from the fracas. Cason's and Love's actions were in aid of Allison as he was engaged with plaintiff in a verbal altercation that quickly turned physical. Indeed, Cason and Love reacted on the spot but nevertheless furthered defendant's interests in backing up a fellow corrections officer and not with malicious purpose, in bad faith, or in a wanton or reckless manner. *See generally Peppers v. Ohio Dept. of Rehab. & Corr.*, 50 Ohio App.3d 87 (10th Dist.1988); *Thomas v. Ohio Dept. of Rehab. & Corr.*, 48 Ohio App.3d 86 (10th Dist.1988); *Booth v. Ohio Dept. of Rehab. & Corr.*, Ct. of Cl. No. 2004-01419, 2005-Ohio-7018. Cason and Love did not initiate a physical attack, but instead, both Cason and Love joined the affray only after Allison hit plaintiff. *Adams v. Ohio Dept. of Rehab. & Corr.*, Ct. of Cl. No. 2013-00140, (July 26, 2016) (finding that officers were not entitled to civil immunity where they engaged in a coordinated, planned, and unprovoked attack on the plaintiff).

{¶33} Moreover, it was not established that Cason and Love were connected to or were coconspirators in a scheme to allow inmates to smoke in exchange for goods. Although Cason and Love both subsequently plead guilty to criminal violations arising out

of this incident, a criminal violation alone does not automatically remove an employee from the scope and course of employment. *McCombs v. Ohio Dept. of Dev. Disabilities*, 10th Dist. Franklin No. 21AP-280, 2022-Ohio-1035, ¶¶ 12-20. Because it does not appear that Cason and Love were coconspirators with Allison, and because Cason and Love only reacted after a physical altercation commenced between Allison and plaintiff, coming to the aid of Allison, the magistrate concludes that Cason and Love did not act with malicious purpose, in bad faith, or in a wanton or reckless manner.

**{¶34}** Based on the foregoing, the magistrate finds that, at all times relevant, Korday R. Allison acted manifestly outside the scope of his employment. Therefore, it is recommended that the court issue a determination that Allison is not entitled to civil immunity pursuant to R.C. 9.86 and 2743.02(F) and that the courts of common pleas have jurisdiction over any civil actions that may be filed against him based upon the allegations of this case. The magistrate further finds that, at all times relevant, Jovan Cason and Paris C. Love acted within the scope of their employment. Therefore, it is recommended that the court issue a determination that Cason and Love are entitled to civil immunity pursuant to R.C. 9.86 and 2743.02(F) and that the courts of common pleas do not have jurisdiction over any civil actions that may be filed against them based upon the allegations of this case.

**{¶35}** *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

GARY PETERSON
Magistrate

**Filed May 4, 2022**
**Sent to S.C. Reporter 7/11/22**